KITE, Justice.
 

 [T1] Lance Oil and Gas Company (Lance) owned an interest in certain wells in northeastern Wyoming, but was not the operator. It took its share of production of natural gas in kind and sold it for less than $2.75 per MCF. When filing its severance tax forms, Lance claimed an exemption pursuant to Wyo. Stat. Aun. § 39-14-205(f) (LexisNex-is 2001) which applies when the price received by the producer for new production is below $2.75 per MCF. The Department of Revenue (DOR) rejected Lance's claim and concluded the exemption applied only when the gross price received by the operator of the wells fell below the trigger price. The State Board of Equalization (SBOE) affirmed DOR's ruling and Lance appealed. The matter was certified to this Court for review. We affirm in part, reverse in part, and remand for further proceedings.
 

 ISSUES
 

 [12] The issues certified are:
 

 1. Did the SBOE correctly determine that the term "price" in the new well incentive statute, Wyo. Stat. § 39-14-205(f), denotes a gross price as opposed to a net price?
 

 2. Did the SBOE correctly determine that the new well incentive trigger price is only the price received by the operator, or does "producer" also mean an owner which takes in kind and receives a price for its production?
 

 STANDARD OF REVIEW
 

 [18] Our standard of review is well established.
 

 When an administrative agency case is certified to this court under WRAP. 12.09(b), we review the decision under the appellate standards applicable to a reviewing court of the first instance. The construction and interpretation of statutes are questions of law which we review de novo. We affirm an agency's conclusions of law when they are in accordance with the law. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the ageney's error.
 

 Wyodak v. Dept. of Revenue, 2002 WY 181, ¶ 9, 60 P.3d 129, ¶ 9 (Wyo.2002) (citations omitted).
 

 [14] We also recognized in Wyodak, ¶¶ 18-19 (some citations omitted) that:
 

 In the conduct of statutory interpretation, we begin by inquiring into the ordinary and obvious meaning of the words employed by the legislature according to the manner in which those words are arranged. If more than one reasonable interpretation exists, we resort to general principles of statutory construction. When the legislature has spoken in unambiguous terms, however, we are bound to the results so expressed.
 

 We have also observed:
 

 It is the court's obligation to make sense out of a statute and give full force and effect to the legislative product; in construing statutes, intention of the lawmaking body must be ascertained from the language of the statute as nearly as possible. A statute must not be given a meaning which would nullify its operation if it is susceptible of another interpretation.
 

 Hasser v. Flint Engineering, 647 P.2d 66, 69-70 (Wyo.1982). Likewise, we will not construe a statute in a way that renders a
 
 *898
 
 portion of it meaningless. With these precepts firmly in mind, we consider the proper meaning of the statutes in question in the context of the entire tax system as established by the constitution and the tax code as a whole.
 

 In State ex rel. Dept. of Revenue v. UPRC, 2003 WY 54, ¶ 12, 67 P.3d 1176, 112 (Wyo.2003) (citations omitted), we recognized:
 

 ... When the words are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. Moreover, "(alll statutes must be construed in pari materio; and in ascertaining the meaning of a given law, all statutes relating to the same subject or haviing] the same general purpose must be considered and construed in harmony."
 

 Therefore, in performing our review, we look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. We have said that divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity. However, the fact that opinions may differ as to a statute's meaning is not conclusive of ambiguity. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court.
 

 FACTS AND HISTORICAL BACKGROUND
 

 [15] The Wyoming legislature enacted Wyo. Stat. Ann. § 39-6-802(s) (Michie 1997) (repealed by Laws 1998, ch. 5, § 4), now § 39-14-205(f), in an effort to encourage the drilling of new oil and gas wells. In 2000, the legislature amended the statute, which now provides:
 

 (£) Crude oil and natural gas produced from wells drilled between July 1, 1998, and March 31, 2003, except the production from collection wells, is exempt from the severance taxes imposed by W.S. 39-14-204(a)iii) and (iv) for the first twenty-four (24) months of production on oil production up to sixty (60) barrels per day or its equivalency in gas production, which for purposes of this subsection shall be six (6) MCF gas production for one (1) barrel oil production, or until the price received by the producer for the new production is equal to or exceeds twenty-two dollars ($22.00) per barrel of oil or two dollars and seventy-five cents ($2.75) per MCF of natural gas for the preceding six (6) month period of time [the "trigger" price]. Provided however, that a taxpayer claiming a tax reduction under this subsection is prohibited from claiming a tax reduction provided by subsection (c) or (e) of this section. Nothing in this subsection shall apply to natural gas produced from any well completed for production at a depth of less than two thousand feet (2,000) from the earth's surface if drilling activities commenced on or after April 1, 2000.
 

 Id. {emphasis added).
 

 [T6] Lance is a "take-in-kind" owner of natural gas produced in Wyoming.
 
 [1]
 
 Barrett Resources Corporation (Barrett) currently operates the wells at issue and sells the remaining natural gas produced on behalf of the other working interest owners.
 

 [17] On October 12, 2000, DOR issued a memorandum to all oil and gas taxpayers, including Lance, concerning § 39-14-205(f) and defining "price" as "the gross sales value of the well divided by the gross sales volume of the well for a particular month." DOR further advised that the "incentive tax rate for a well expires after the above listed "strike' [trigger] price has been met or exceeded for six consecutive months for that product on that well."
 

 
 *899
 
 [18] On January 23, 2001, DOR advised Lance that the exemption had expired on the wells in question because the price Barrett received for the rest of the working interest owners had exceeded the statutory "trigger" price for six consecutive months. Lance objected, contending that the "trigger" price of $2.75 per MCF should not be interpreted to mean the gross sales price, but the net price or taxable value, i.e., the gross price less any transportation, processing, or other expenses incurred by the taxpayer prior to sale of the natural gas. Lance also asserted the new well incentive should be based on the price received by each take-in-kind taxpayer as opposed to only the price received by the operator on behalf of working interest owners not taking in kind.
 

 [19] Subsequently, Lance sought tax-exempt status for certain 2000 and 2001 gas production under § 39-14-205(f). DOR denied this request. On appeal, SBOE af firmed DOR's denial of tax-exempt status to Lance. Lance then filed a petition for review in the district court, which certified the case to this Court.
 

 DISCUSSION
 

 1. Gross Price or Net Price
 

 [¥10] Lance argues the term "price" as used within § 39-14-205(f) means a "net" price and had the legislature intended the incentive to be based on a "gross" price, it could have easily specified that intention. In addition, Lance proffers that in order to harmonize the statutes that impose takes with this exemption statute, § 89-14-205(f), this Court must conclude the term "price" means "net" price or taxable value.
 

 [111] In countering Lance's arguments, DOR argues the term "price" as used within § 39-14-205(F) is unambiguous and refers to "gross" price because the commonly accepted definition of the word "price" when used alone implies a "gross" price as opposed to a "net" price calculated after allowed deductions. DOR also asserts that had the legislature meant "net" price or taxable value, it simply could have said so as it has done in other tax statutes.
 

 {T12] Our analysis must begin with a determination of whether $ 89-14-205(f) is unambiguous. If the statute is unambiguous, we must give effect to the plain and ordinary meaning of the language used in the statute. Construction of legislative enactments is only appropriate where the enactment has first been found, as a matter of law, to be ambiguous. A statute is unambiguous if its wording is such that reasonable persons are able to agree to its meaning. Airtouch Communications, Inc. v. Dept. of Revenue, 2003 WY 114, ¶ 14, 76 P.3d 342, ¶ 14 (Wyo.2003) (citing Snake River Brewing Co., Inc. v. Town of Jackson, 2002 WY 11, ¶ 29, 39 P.3d 397, ¶ 29 (Wyo.2002)); Petroleum Inc. v. State ex rel. State Board of Equalization, 983 P.2d 1237, 1240 (Wyo.1999); Chevron U.S.A., Inc. v. State, 918 P.2d 980, 984 (Wyo.1996); General Chemical Corp. v. State Board of Equalization, 819 P.2d 418, 420 (Wyo.1991); State ex rel. Dept. of Rev. v. UPRC, ¶ 12; and Wyodak, ¶1 18-19.
 

 [113] We do find the term "price" as used in § 39-14-205(F) to be unambiguous. The common meaning of the word "price" is: the amount of money or other consideration asked for or given in exchange for something else; the quantity of one thing that is exchanged or demanded in barter or sale for another; or cost at which something is obtained. See Black's Law Dictionary 1207 (7th ed.1999); Webster's Third New International Dictionary 1798 (1966)
 
 [2]
 
 Lance argues that had the legislature intended "gross" price, it would have used the word "gross." We disagree. Since the term "price" means the full amount paid, there was no need to specify "gross" price. Contrary to Lance's contention, we conclude if the legislature intended "net" price, it would have so stated.
 

 [T 14] Even assuming that § 39-14-205(f) could be deemed ambiguous, we would reach the same result by construing its meaning in light of other related Wyoming severance tax statutes. Throughout those statutes, the
 
 *900
 
 term "price" is not synonymous with "net" price or taxable value. Rather, when the legislature has addressed the deduction of expenses or a "net" price, it has done so in the context of determining "fair market value" or "value," as opposed to simply "price." For instance, Wyo. Stat. Ann. § 39-14-203(b)(i) (LexisNexis 2003) states in applicable part, "expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral." In the same way, Wyo. Stat. Ann. § 89-14-208(b)(vi)(B) (LexisNexis 2003) provides, under a comparable value computation, that "fair market value is the arms-length sales price less processing and transportation fees charged to other parties." Similarly § 39-14-2083(b)(vi)(C) states, under a netback calculation, "fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees." Thus, we conclude the term "price" as used by the legislature is distinguished from taxable value which is a "net" price. We find unpersuasive Lance's argument that it should be allowed to subtract its post-production transportation and other processing costs to arrive at the net "price" of the mineral for purposes of applying the new well incentive.
 

 [T15] We also find inapplicable Pacifi-Corp, Inc. v. Dept. of Revenue, 2001 WY 84, 31 P.3d 64 (Wyo.2001), which held that the appraised value of tax exempt property must be calculated in the same manner as taxable property, constituting an "apples to apples" comparison. In the new well incentive statute, the legislature was not addressing appraised value, but instead was defining the market conditions in which it was willing to provide a tax incentive to producers. Therefore, comparing the trigger price in the incentive statute to the fair market value is truly an "apples to oranges" comparison.
 

 [M16] Lance's interpretation of "price" also ignores the legislature's clear intent, which was to encourage the drilling of new wells at times in which the market price for oil and gas is low. If Lance's interpretation were correct, it would transform the new well incentive into a benefit for those paying higher processing, transportation and related costs, which is not the actual purpose of the new well incentive.
 

 2. Producer
 

 [T17] In its second issue, Lance argues that the term "producer" as set forth in § 39-14-205(f) includes both working interest owners who are operators and take-in-kind interest owners who report their own production and pay taxes on that production. DOR contends the term "producer" unambiguously refers only to the entity that physically extracts the oil. DOR seems to infer that the term "producer" is analogous to the term "operator." DOR also asserts that the legislature's use of the word "producer" with respect to the trigger price, but use of the term "taxpayer" later in the statute, indicates the legislature was making a distinction between these two terms. Therefore, DOR argues that every producer is a taxpayer, but all taxpayers are not producers.
 

 [T18] Upon review of the language used by the legislature in § 389-14-205(f), we conclude the term "producer" is ambiguous and when construed in context includes a working interest owner who receives a price for its production. SBOE disagreed with Lance's suggestion that "producer" meant the same thing as "taxpayer." SBOE contended that by using two different terms, the legislature meant to refer to two different entities. We do not suggest that "producer" and "taxpayer" are interchangeable, but only that "producer" in this context means an owner that receives a price for its new production. This interpretation does not render the word "taxpayer" used within the latter portion of the statute meaningless, as suggested by SBOE. That reference is to the entity claiming the deduction and if the oil or gas qualifies for an exemption because of the price for which it is sold, all owners of that production are taxpayers who could claim the deduction. The term producer is simply used to determine when an exemption is available, not who is entitled to the exemption.
 

 [119] In interpreting statutes, we are governed by the fundamental rule that the role of the courts is to give effect to the plain meaning of unambiguous terms chosen by
 
 *901
 
 the legislature. Union Pacific Resources Co. v. Dolenc, 2004 WY 36, ¶ 13, 86 P.3d 1287, ¶ 13 (Wyo.2004). If a statute is unambiguous, we need not apply the traditional rules of statutory construction. Id. Whether a statute is ambiguous is a question of law. Id. We conclude DOR and SBOE were incorrect in concluding the term "producer," as used by the legislature in this context, is unambiguous. The best evidence of this mistaken conclusion is DOR's need to resort to various rules of statutory construction in order to arrive at the meaning it ascribes to the term.
 

 [120] An ambiguous statute is one whose meaning is uncertain because it is susceptible to more than one interpretation. Allied-Signal v. State Board of Equalization, 813 P.2d 214, 219 (Wyo.1991); State Board of Equalization v. Tenneco, 694 P.2d 97, 100 (Wyo.1985). A "producer" could mean one who owns a working interest in oil and gas, invests in the drilling of wells to produce that resource, and sells that production to a third party, thus "receiving a price." "Producer" could also mean the party who operates the well and is responsible for physically bringing the oil to the surface. The term "producer" is not defined in the taxation statutes or DOR's regulations. Nor is it a technical term in the ofl and gas industry such that it has a well-developed meaning.
 

 [121] In the development and production of any oil and gas well, various actors play a part: the lessor as the owner of the oil and gas estate who usually retains a royalty interest; the lessees who each have the right to drill and produce the resource and are referred to as the "working interest" owners; the operators of the well who are usually, but not always, one of the working interest owners; and the purchasers of the production. In many cases, others may have an interest in the revenue produced by the well, although no control over its operation, such as owners of overriding royalty interests and production payments. Most wells involve multiple working interest owners each owning a percentage share of the leasehold estate. Any working interest owner can decide to drill a well and the other working interest owners must either consent and pay their share, or go "non-consent" and, if the well is productive, their share of the expenses plus a penalty will be deducted from their share of the revenue. Wyo. Stat. Ann. § 30-5-109(g) (LexisNexis 2008). Working interest owners usually contract through operating agreements to have one such owner conduct the day-to-day operations of the well. 27A Rocky Mountain Mineral Law Institute, "Cry Wolf: Sherman & Clayton Acts," p. 21-23 (Matthew Bender 1982). Most operating agreements provide that individual working interest owners are responsible for disposing of their share of production and for paying the required taxes and royalties due on that production. 6 Walter L. Summers, Oil and Gas, Ch. 41, § 1328, p. 183 (West 1967); 27B Rocky Mountain Mineral Law Institute, "Oil and Gas Operations," p. 1665. If an owner fails to take in kind or make arrangements to dispose of its proportionate share, the operator may either purchase the oil and gas or sell it to others. Id. In a typical operating agreement, no one is delineated as the "producer."
 

 [122] The statutes governing the taxation of oil and gas define only one of these actors, e.g. "purchaser" which means "first purchaser who acquires the produced crude oil, lease condensate or natural gas from the taxpayer for value." Wyo. Stat. Ann. § 39-14-20l1(a)(xvi) (LexisNexis 2003). DOR's rules and regulations define "operator" as "any person responsible for the day-to-day operation of a mine or oil and gas property by reason of contract, lease or operating agreement or ownership of an unleased producing mine or well operated by the owner thereof" Dept. of Rev. Rules, Ch. 6, § 4G). A dictionary of the technical meaning of terms used in the oil and gas industry recognizes that the term "producer" can include, "an operator who owns wells that produce oil or gas," "a person who owns or is entitled to a share of production or the proceeds thereof" and "the 'operator' of a well or wells." Howard R. Williams, & Charles J. Meyers, Manual of Oil and Gas Terms, 846 (Ith Ed.2000). Thus, in the oil and gas industry, the term "producer" can mean two different entities, an owner who operates wells or an owner who simply is entitled to a share of the production.
 

 
 *902
 
 [123] While the oil and gas severance tax statutes do not define "producer," the statutes governing oil and gas production do. Wyo. Stat. Ann. § 80-5-101(vi) (LexisNexis 2003)
 
 [3]
 
 defines the term as "the owner of a well or wells capable of producing oil and gas or both." The term "owner" is further defined as "the person who has the right to drill into and produce from a pool and to appropriate the oil and gas he produces therefrom either for himself or others." Wyo. Stat. Ann. § 80-5-101(v) (LexisNexis 2008)8 While this definition does not directly control the meaning of the term as it is used in the tax statutes, it is certainly reasonable for us to assume the legislature was aware of it and understood how the term was used in the regulation of the industry as a whole at the time it adopted the incentive statute. Both Barrett and Lance would obviously qualify as a producer under these definitions.
 

 [T24] Without a statutory definition in the tax statutes themselves, and given the various possible meanings within the industry, and the use of the term in the general oil and gas statutes, the conclusion is unavoidable that the term "producer" in this context is ambiguous. Applying the rules of statutory construction to this ambiguous term, we must first look at the context in which the term is used. Board of County Comm'rs v. City of Cheyenne, 2004 WY 16, ¶ 27, 85 P.3d 999, ¶ 27 (Wyo.2004). "Producer" is used to describe the "price" that serves to trigger the tax exemption. It would appear the legislature intended the trigger price to be that price received by any producer of oil or gas from the well in question. Certainly, the legislature was aware that different owners could receive different prices for their share of the production. Had it intended only one producer's price should govern the exemption for all owners, it could have said so. DOR worries that such an interpretation could allow a non-operating working interest owner to receive an exemption while the operating working interest owner did not. That is certainly true, but it is likewise true, as recognized by the SBOE, that using only the operating working interest owner's price as the trigger, as suggested by DOR, could allow a non-operating, take-in-kind working interest owner who was obtaining a price higher than the trigger price to receive an exemption anyway. We find it more likely that the legislature intended that only owners receiving less than the trigger price should be entitled to an exemption, rather than intending that an owner receiving a price higher than the trigger price should get an exemption simply because the operating owner received a price lower than the trigger price.
 

 [125] This conclusion is consistent with the apparent purpose of the statute to encourage those considering investing in oil well drilling to do so even in the face of low market prices. All working interest owners (other than those choosing the "non-consent" option) participate in the decision to drill a particular well, not just the operator. Operators often change depending on the business considerations of all the owners. In fact, in this case, Lance drilled 298 out of the 400 wells in question and was the original operator of most of the wells until July of 1999, when Barrett was chosen as the operator. DOR's inference that a take-in-kind owner is somehow not involved in the investment decision, and that the trigger price would not operate ag an incentive to that owner, is simply unsupportable.
 

 [T26] In a somewhat confusing analysis, DOR seems to suggest that because the severance tax is imposed on the privilege of extracting the mineral, somehow that fact requires the conclusion that only the operating owner "severs" the mineral and therefore, is the producer. However, both the statutes, and the DOR rules implementing them, provide that the owner of the mineral, not the operator, is responsible for paying the severance taxes. Section 39-14-208(c)(i) provides:
 

 
 *903
 
 In the case of severance taxes, any person extracting crude oil, ... and any person owning an interest in the crude oil, ... production to the extent of their interest ownership are liable for the payment of the severance taxes. ...
 

 The phrase "to the extent of their interest ownership" modifies "any person extracting" and "any person owning" and, read properly, the statute clearly provides that each owner is responsible for taxes to the extent of their ownership. That concept is repeated in the DOR rules, in the section entitled "Persons Responsible for Remittance of Tax: Take in Kind Election, Term, Termination, and Exchange of Information," which provides, "(alll severance taxes on the gross product from an oil or gas property attributable to any working or non-working interest owners shall be remitted by the interest owner or may be remitted on behalf of the interest owner in proportion to his ownership interest by the operator." Dept. of Rev. Rules, Ch. 6, § With regard to take-in-kind working interest owners, the rules provide the take-in-kind owner must pay the tax or specifically elect the option of having the operator pay on its behalf. Dept. of Rev. Rules, Ch. 6, § 6(2)@).
 

 [127] DOR seems to be advocating for the creation of a new classification of owner, one that operates the well and, it argues, pays all the taxes, as the owner that actually "severs" or "produces" the oil. This reasoning ignores the reality that all of the owners participate in that severance and, as a result, are liable for the severance tax. The severance tax construct simply does not contain any reference to a "producer." DOR's position could result in the exemption being triggered by the price received by a contract operator. This result would not further the legislative intent of encouraging those responsible for drilling decisions, e.g. the owners, to drill when prices are low.
 

 [128] As another reason for denying the exemption to a take-in-kind owner, DOR seems to suggest that to do otherwise would encourage such owners to seek a lower price for their production or not adequately market their production simply to obtain the exemption. These concerns ignore the realities of the marketplace. All owners are motivated to get the best price and terms possible for their production. In some cases, the terms, e.g. contract length, may dictate a lower price, which may account for the differences in prices obtained by various owners in the same well. Even if DOR's counter-intuitive suggestion were accurate, it would apply as well to the "owner who is extracting," which DOR would say is entitled to the exemption.
 

 [T29] DOR suggests any ambiguity must be resolved in favor of denying the exemption because of the rule that tax exemptions are not favored and must be strictly construed. State Board of Equalization v. Wyoming Automobile Dealers Ass'n, 395 P.2d 741 (Wyo.1964). However, that rule does not prevent the correct interpretation of a statute simply because that interpretation results in an exemption.
 

 When it is said that exemptions must be strictly construed in favor of the taxing power, this does not mean that if there is a possibility of a doubt it is to be at onee resolved against the exception. It simply means that if, after the application of all rules of interpretation for the purpose of ascertaining the intention of the legislature, a well founded doubt exists, then an ambiguity occurs which may be settled by the rule of strict construction.
 

 Cooley, The Law of Taxation § 674, p. 1415 (1924). Further, an interpretation that has the effect of denying Lance an exemption because only one "producer" can exist on a well is not "strict construction" because it would allow a take-in-kind owner who gets a higher price than the trigger price to still qualify for an exemption if the operator/producer received a lower price. DOR's interpretation would succeed only in denying the current applicant's exemption without consideration of how future applicants could expand the exemption beyond what the legislature intended.
 

 [130] While the legislature did not provide us with much to go on in understanding the meaning of the "price received by the producer," the most logical interpretation must include any owner who sells its own production and receives a price. In this
 
 *904
 
 case, that would include both Barrret and Lance. If the legislature meant something different, it certainly could have said so in plain language.
 

 CONCLUSION
 

 [131] We affirm the SBOE's conclusion that the term "price" as used in § 89-14-205(f) is unambiguous and means gross price. However, we hold that the term "producer" as used in the statute is ambiguous. Applying accepted rules of statutory construction, we conclude "producer" means any oil and gas owner that receives a price for the sale of its share of production, including a take-in-kind owner. Consequently, the SBOE order is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 

 [1]
 

 . A "take-in-kind" owner is generally defined as a party who elects to take a portion of the mineral produced rather than receive monetary remuneration for their share of the production. (Dept. of Rev. Rules, Ch.6, Sec. 4 a(s)).
 

 [2]
 

 . Similarly, § 39-14-201(a)@) defines "arm's length market or sales price" as the transaction price determined in connection with a bona fide arm's length sale.
 

 [3]
 

 . Lance's brief refers to these definitions as being included in the "Wyoming Royalty Payment Act." However, they are located at the beginning of the general oil and gas statutes and apply "in this act'" which addresses the regulation of oil and gas development by the Oil and Gas Conservation Commission, the Interstate Compact on Conservation, as well as the Payment for Interests in Production.