# IN THE SUPREME COURT, STATE OF WYOMING

# 2017 WY 6

OCTOBER TERM, A.D. 2016

January 23, 2017

WYODAK RESOURCES
DEVELOPMENT CORP.,

Appellant
(Petitioner),

v.

S-16-0075

WYOMING DEPARTMENT OF
REVENUE,

Appellee
(Respondent).

*W.R.A.P Rule 12.09(b) Certification from*
*the District Court of Campbell County*
The Honorable Michael N. Deegan, Judge

*Representing Appellant:*

Lawrence J. Wolfe, P.C. and Jenifer E. Scoggin, P.C. of Holland & Hart, LLP, Cheyenne, Wyoming. Argument by Mr. Wolfe.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; Ryan Schelhaas, Deputy Attorney General; Karl D. Anderson, Senior Assistant Attorney General. Argument by Mr. Anderson.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ**, Justice.

[¶1]    Appellant Wyodak Resources Development Corp. (Wyodak) is a coal producer in Campbell County, Wyoming and reports the taxable value of its coal to Appellee Department of Revenue (Department) using the proportionate profits valuation method. Wyodak claims the Department improperly applied Wyoming law when it set the point of valuation for its coal for production years 2009 through 2011.   It also challenges the Department's categorization of certain government-imposed and environmental expenses in the tax valuation formula.  The Board of Equalization (Board) upheld the Department's determinations, and Wyodak petitioned for judicial review.   We conclude the Board's decision on the point of valuation was correct and affirm that ruling.

[¶2]    The environmental and government-imposed expenses were under audit at the time of the hearing before the Board.  Given the audit will result in a more complete factual record and the results are subject to further administrative and, if necessary, judicial review, the Board's decision on the categorization of the costs was not final and the issue is not  ripe for judicial review.

## ISSUES

[¶3]    The issues which must be resolved in this appeal[1] are:

        1.      Did the Board err by upholding the Department's determination that the mouth of the mine and, consequently, the point of valuation for Wyodak's coal, was located where the coal actually reached the surface of the ground rather than where Wyodak calculated it to be?

        2.      Was Wyodak's right to equal and uniform taxation under the Wyoming Constitution violated by the Board's decision on the point of valuation?

        3.      Did the Board issue a final decision on whether the Department's classification of Wyodak's environmental and government-imposed costs was correct and is that issue ripe for review?

## FACTS

[¶4]    Wyodak owns a surface coal mine approximately five miles east of Gillette in Campbell County, Wyoming.  During the years in question, Wyodak mined out of the Clovis Pit which is located north of I-90. The Gillette Energy Complex is a group of

---

[1] Wyodak initially raised an additional issue regarding classification of its conveyor costs.  However, at oral argument, it stated that it was not going to pursue the issue.

1

several power plants located south of I-90 and is the primary customer for Wyodak's coal.

[¶5]    During the mining process, the topsoil and overburden are removed to expose the coal seam. The removed material is used to backfill mined areas. The Clovis Pit coal seam is divided into two benches -- the top bench is approximately fifty feet deep and the bottom bench is approximately thirty feet deep. The bottom bench contains higher quality coal than the top bench. Wyodak severs the coal from the vertical coal face of each bench by blasting explosives. As the coal is extracted, the coal face moves in a northerly direction, away from I-90.

[¶6]    For the Wyodak coal destined for the energy complex, front end loaders take the severed coal to a primary crusher located near the coal face of each bench. The primary crushers break it into uniform pieces about eight inches in diameter and dump it onto mobile conveyors. The mobile conveyors transport the coal to a permanent conveyor, where coal from the two benches is blended to the customer's specifications.

[¶7]    The permanent conveyor is located in a "transportation corridor," which was formed when the top bench of coal was mined and not backfilled. The transportation corridor is 50 to 250 feet lower than the surrounding topography. The permanent conveyor carries the coal south, crosses under I-90 via a tunnel and delivers the coal to the energy complex.

[¶8]    The coal that is not transported on the permanent conveyor is hauled out of the pit in trucks via a haul road. The road begins in the pit and climbs until it reaches the surface of the surrounding land. The trucks carry the coal along the haul road to a train load-out facility north of the mine, where it is transported by train to the Dave Johnston power plant in Glenrock, Wyoming.

[¶9]    Wyodak annually reports its coal production, expenses and resulting taxable value to the Department. Wyoming statutes establish that the point of valuation for coal, when reporting its value for tax purposes, is the mouth of the mine. Wyo. Stat. Ann. § 39-14-103(b)(ii) (LexisNexis 2015); DOR Rules, ch. 6, § 4(b)(i) (2006). The Department and Wyodak historically recognized the mouth of the mine for coal sent to the energy complex at the point where the permanent conveyor entered the I-90 tunnel.[2]

[¶10]  Wyodak initially reported its 2009, 2010 and 2011 taxable values for the coal sent to the energy complex using the entry to the I-90 tunnel as the mouth of the mine. We will explain the tax structure in more detail later, but in general, costs incurred before the

---

[2] The Department understands that the conveyor does not rise completely to the surface until shortly after it exits the tunnel on the south side of I-90, but agreed that the inlet to the tunnel was the mouth of the mine because the additional distance did not have any appreciable effect on taxable value.

2

mouth of the mine are considered direct mining costs and increase the taxable value of the mineral. Because the I-90 tunnel was the mouth of the mine, most of the permanent conveyor costs were considered direct mining costs. Wyodak subsequently reevaluated the location of the mouth of its mine because each year the coal face had moved farther north, away from I-90, increasing the direct mining costs associated with the conveyor system, and thereby increasing the taxable value of the coal. By 2011, the transportation corridor was 8,080 feet, or approximately one and one-half miles, long.

[¶11] Wyodak used a 1999 Wyoming Mining Association memorandum prepared by Donald Coovert to "relocate" its mine mouth for tax purposes by assuming that the conveyor system did not exist. Mr. Coovert is a coal tax consultant who testified for Wyodak at the hearing before the Board. The memo provided a method to calculate where the mouth of the mine would be if Wyodak used a truck haul road, instead of the permanent conveyor, to transport its coal to the energy complex. Wyodak's calculations artificially moved the mouth of the mine significantly closer to the coal face, thereby reducing its direct mining costs and, accordingly, the taxable value of its coal.

[¶12] In 2013, Wyodak filed amended returns for production years 2009, 2010 and 2011. The amended returns reflected the calculated locations of hypothetical mouths of the mine for each year assuming no permanent conveyor system existed and re-categorized various environmental and government-imposed expenses as indirect instead of direct costs, resulting in a reduction of Wyodak's taxes. The Department did not agree with Wyodak's new calculated mouth of the mine locations or its re-categorization of expenses and rejected the amended returns.

[¶13] Wyodak appealed the Department's decision to the Board, and the Board held a contested case hearing on November 12 through 14, 2013. It issued its findings of fact, conclusions of law and order on December 18, 2015, ruling that the Department's determinations on Wyodak's mouth of the mine and categorization of mining expenses were correct. Wyodak filed a petition with the district court for review of the Board's decision. The parties and the district court agreed that the case should be certified to this Court pursuant to W.R.A.P. 12.09, and we accepted the certification.[3]

---

[3] W.R.A.P. 12.09 states in relevant part:

> (b) Upon such review, or in response to a motion for certification or interlocutory appeal by any party within 30 days of the filing of the petition for review and after allowing fifteen (15) days from service for response, the district court may, as a matter of judicial discretion, certify the case to the supreme court. In determining whether a case is appropriate for certification, the district court shall consider whether the case involves:
>
> (1) a novel question;
>
> (2) a constitutional question;
>
> (3) a question of state-wide impact;

**STANDARD OF REVIEW**

[¶14] When an administrative agency case is certified to this Court under W.R.A.P. 12.09(b), we apply the standards for judicial review set forth in Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2015). *Wyodak Resources Dev. Corp. v. Dep't of Revenue,* 2002 WY 181 ¶ 9, 60 P.3d 129, 134 (Wyo. 2002). The Board's findings of fact are reviewed under the substantial evidence standard. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008); Section 16-3-114(c). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. State ex rel. Wyo. Workers' Comp. Div.,* 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005) (citation omitted). Findings of fact are supported by substantial evidence when we can discern a rational premise for those findings from the evidence preserved in the record. *Id.*

[¶15] We review an agency's conclusions of law *de novo* and affirm when they are in accordance with the law. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Dale,* ¶ 26, 188 P.3d at 561-62. This case requires interpretation of the relevant statutes, which is a matter of law subject to *de novo* review. *DB v. State (In re CRA),* 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016).

**DISCUSSION**

[¶16] Resolution of this case requires interpretation and application of Wyoming mineral taxation statutes. In order to provide proper context for the specific issues presented by Wyodak, we will begin by describing the statutory framework used to value its coal.

### 1.   *General Law on Coal Taxation/Direct Cost Ratio*

---

(4) an important local question which should receive consideration from the district court in the first instance;

(5) a question of imperative public importance; or

(6) whether an appeal from any district court determination is highly likely such that certification in the first instance would serve the interests of judicial economy and reduce the litigation expenses to the parties. . . .

(c) Not later than 15 days after its receipt of the completed record, the district court shall notify the parties of its decision concerning certification by order, which shall include a concise statement of the issues raised in the petition and findings which support the determination concerning certification. . . .

(d) The Supreme Court, in its discretion, may accept or reject a certified case, and it shall accept or reject the case within 30 days of receiving the certification order. . . .

[¶17]   Wyo. Const. art. 15, § 3 provides that all coal mines "shall be taxed ... in lieu of taxes on the lands[ ] on the gross product thereof ...; provided, that the product of all mines shall be taxed in proportion to the value thereof."   "The legislature is directed to define full value for the classes of property and to enact laws securing "'a just valuation for taxation of all property ....'"   *RME Petroleum Co. v. Dep't of Revenue,* 2007 WY 16, ¶ 14, 150 P.3d 673, 679 (Wyo. 2007), quoting Wyo. Const. art. 15, § 11.   Exercising that power, the legislature has imposed ad valorem and severance taxes on the value of gross mineral production. Wyo. Stat. Ann. § 39-13-103 (LexisNexis 2015) (ad valorem tax), § 39-14-103 (severance tax).   Coal is valued for purposes of taxation at "the fair market value of the product at the mouth of the mine where produced, after the mining or production process is completed."   Section 39-14-103(b)(ii).[4]

[¶18]   Pursuant to Wyo. Stat. Ann. § 39-14-101(a)(vi),  the mouth of the mine is defined as:

> [t]he point at which a mineral is brought to the surface of the ground and is taken out of the pit, shaft or portal. For a surface mine, this point shall be the top of the ramp where the road or conveying system leaves the pit. For an in situ mine, the point shall be the wellhead.

Section 37-14-101(a)(v) defines mining or production as:

> drilling, blasting, loading, roadwork, overburden removal, pre-mouth of the mine reclamation, transportation from the point of severance to the mouth of the mine, and maintenance of facilities and equipment directly relating to any of the functions stated in this paragraph.

[¶19]   Like most Wyoming producers, Wyodak sells its coal away from the mouth of the mine.   For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, § 39-14-103(b)(vii) establishes a formula, commonly known as the proportionate profits valuation method, to determine what portion of the sales value is attributable to the value of the gross product at the mouth of the mine.   *Powder River Coal Co. v. Wyo. State Bd. of Equalization,* 2002 WY 5, ¶ 8, 38 P.3d 423, 427 (Wyo. 2002).   Section 39-14-103(b)(vii) states in part:

> (vii) For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, the department shall calculate

---

[4] The Department's rules in effect at the relevant time stated the "mouth of the mine" was the point of valuation and defined the term consistent with the definition in Wyo. Stat. Ann. § 39-14-101(a)(vi) (LexisNexis 2015).  The point of valuation was defined consistent with § 39-14-103(b)(ii).  DOR Rules, ch. 6, § 4a(b) (2006) (definition of mouth of the mine); ch. 6, § 4(i) (2006) (definition of point of valuation).

the fair market value of coal by multiplying the sales value of extracted coal, less transportation to market provided by a third party to the extent included in sales value, all royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees, by the ratio of direct mining costs to total direct costs. Nonexempt royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees shall then be added to determine fair market value.

[¶20] This Court expressed the proportionate profits method as a mathematical formula in *RME, ¶* 17, 150 P.3d at 681:



[¶21] Wyoming's proportionate profits formula uses a ratio of direct mining costs to total direct costs (the direct cost ratio). Section 39-14-103(b)(vii). More direct mining costs result in a higher direct cost ratio. The taxable value of the mineral increases or decreases as the direct cost ratio does, so the higher the direct cost ratio, the higher the taxable value. To determine the correct direct cost ratio and, thereby, the proper taxable value, costs have to be correctly categorized as direct mining costs, total direct costs or indirect costs. Direct mining costs are defined as:

mining labor including mine foremen and supervisory personnel whose primary responsibility is extraction of coal, supplies used for mining, mining equipment depreciation, fuel, power and other utilities used for mining, maintenance of mining equipment, coal transportation from the point of severance to the mouth of the mine, and any other direct costs incurred prior to the mouth of the mine that are specifically attributable to the mining operation[.]

Section 39-14-103(b)(vii)(B). Section 39-14-103(b)(vii)(C) defines total direct costs:

6

(C) Total direct costs include direct mining costs determined under subparagraph (B) of this paragraph plus mineral processing labor including plant foremen and supervisory personnel whose primary responsibility is processing coal, supplies used for processing, processing plant and equipment depreciation, fuel, power and other utilities used for processing, maintenance of processing equipment, coal transportation from the mouth of the mine to the point of shipment, coal transportation to market to the extent included in the price and provided by the producer, and any other direct costs incurred that are specifically attributable to the mining, processing or transportation of coal up to the point of loading for shipment to market[.]

[¶22]  In general, costs incurred prior to the mine mouth are direct mining costs and are included in the numerator of the direct cost ratio.  Costs incurred after the mine mouth are included in the total direct cost category which is the denominator of the direct cost ratio.  Indirect costs "include but are not limited to allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically attributed to an operational function without allocation." They are not included in the direct cost ratio at all.  Section 39-14-103(b)(vii)(D).

[¶23]  The primary dispute in this case is over how to assign the costs associated with the permanent conveyor.  The legislature recognized that transportation would occur both prior to and after the mouth of the mine.  It included "transportation from the point of severance to the mouth of the mine" in the definition of mining or production at § 39-14-101(a)(v), and "transportation from the mouth of the mine to the loadout" in the definition of processing at § 39-14-101(a)(vii).  The location of the mouth of the mine, therefore, determines whether transportation costs will be classified as direct mining costs or total direct costs.

[¶24]  If, as the Department ruled, the mouth of Wyodak's mine is at the I-90 tunnel, the transportation costs associated with the permanent conveyor are direct mining costs (which increases the taxable value).  If Wyodak is correct and the mouth of the mine is closer to the coal face, the costs associated with the conveyor are included only in the total direct cost category (which decreases the taxable value).  Assignment of the disputed costs to direct mining costs results in a direct cost ratio of approximately .89, while the assignment of the costs to the total direct cost category results in a direct cost ratio of approximately .83.  The difference in Wyodak's tax obligation totals approximately $880,000 for all three years.

### 2.      The Mouth of the Mine

7

### *a.* *Statutory Interpretation*

[¶25] The parties disagree on the proper location of the mouth of Wyodak's mine for tax purposes. To decide this issue, we must interpret the relevant statutes. When interpreting statutes, this Court searches for the legislature's intent as reflected in the language of the statute. *Vance v. City of Laramie,* 2016 WY 106, ¶ 12, 382 P.3d 1104, 1106 (Wyo. 2016). Our first task is to determine, as a matter of law, whether the statute is clear or ambiguous. *Lance Oil & Gas Co. v. Dep't of Revenue,* 2004 WY 156, ¶ 4, 101 P.3d 899, 901 (Wyo. 2004).

> "We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations."

*RME*, ¶ 25, 150 P.3d at 683. *See also Powder River Coal,* ¶ 6, 38 P.3d at 426. The fact that the parties have differing opinions on the statute's meaning is not conclusive as to ambiguity. *Bd. of County Comm'rs of Sublette County v. Exxon Mobil Corp.,* 2002 WY 151, ¶ 24, 55 P.3d 714, 721 (Wyo. 2002).

[¶26] "If the statutory language is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning." *In re CRA,* ¶ 16, 368 P.3d at 298. We give effect to each word, clause and sentence chosen by the legislature, and construe them *in pari materia*. *Pedro/Aspen, Ltd. v. Bd. of County Comm'rs,* 2004 WY 84, ¶ 27, 94 P.3d 412, 420 (Wyo. 2004). A statute is not interpreted in a way that renders a portion of it meaningless or adds language to it. *Id. See also MF v. State,* 2013 WY 104, ¶ 11, 308 P.3d 854, 858 (Wyo. 2013) (stating this Court does not add language to a statute in interpreting it).

[¶27] We look beyond the language of the statute and apply rules of statutory construction to determine the legislature's intent only when the language is ambiguous. A statute is ambiguous if it is vague or uncertain and susceptible to more than one reasonable interpretation. *RME,* ¶ 25, 150 P.3d at 683; *Chevron, U.S.A. Inc. v. Dep't of Revenue,* 2007 WY 43, ¶ 10, 154 P.3d 331, 334 (Wyo. 2007).

> When the language is not clear or is ambiguous, the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and

8

contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent.

*Chevron,* ¶ 15, 154 P.3d at 335, quoting *State ex rel. Motor Vehicle Div. v. Holtz,* 674 P.2d 732, 736 (Wyo. 1983) (other citations omitted).

[¶28] As noted above, the legislature defined the mouth of the mine in relevant part as:

the point at which a mineral is brought to the surface of the ground and is taken out of the pit, shaft or portal. For a surface mine, this point shall be the top of the ramp where the road or conveying system leaves the pit.

Section 39-14-101(a)(vi).

[¶29] Neither party argues the definition of mouth of the mine is ambiguous. They simply have differing views of the plain meaning of the statutory language. The Department interprets the statute as placing the mouth of the mine at the point where the coal reaches the surface of the surrounding topography which, for Wyodak's mine, is at the I-90 tunnel. Wyodak asserts the "mouth of the mine" is the point where the coal leaves the "active pit," which it defines as "the area or hole where a coal company takes possession of the coal through active mining activities described in [§] 39-14-101(a)(v), such as mining or blasting." In its view, active mining activities do not include transportation on the permanent conveyor. Its interpretation places the mouth of its mine at a point near where the coal is placed on the permanent conveyor. We conclude that the statutory definition of mouth of the mine is not ambiguous. The legislature provided clear directions to locate the mouth of the mine.

[¶30] Wyodak focuses on the word "pit" in arguing for a mouth of the mine closer to the coal face. That word is certainly important to the analysis. The legislature located the mouth of the mine at the point at which a mineral is brought to the surface of the ground and is **taken out of the pit**. . . . It further clarified that, "for a surface mine, this point shall be the top of the ramp where the road or conveying system **leaves the pit**." Section 39-14-101(a)(vi) (emphasis added).

[¶31] "Pit" is not defined by statute or the Department's rules, so the Board appropriately looked to common dictionary definitions of the word "pit" in the context of mining:

Mining.
    a. An excavation made in exploring for or removing a mineral deposit, as by open cut methods.

9

       b. The shaft of a coal mine.
       c. the mine itself.

The definition clearly states that the pit is the excavation made in exploring for or removing a mineral deposit. It does not limit the "pit" to the area where the mining company takes possession of the coal. Although "pit" is also defined as "the mine itself," the definition does not include the "active mining" concept championed by Wyodak. In fact, its argument that the word "pit" means the "active pit," adds the word "active" to the statutory language. This Court is not at liberty to add words to a statute that the legislature chose to omit. *See MF,* ¶ 11, 308 P.3d at 858 (stating "we will not supply missing terms or expand a statute's meaning beyond its plain language").

[¶32] Furthermore, Wyodak's interpretation ignores the other language the legislature used in § 39-14-101(a)(vi) to define the mouth of the mine. The legislature specifically stated the mouth of the mine is where the coal is brought to the surface of the ground and taken out of the pit. This language demarcates the end of the pit as the surface of the ground and locates the mouth of the mine at that distinct point. The legislature reinforced the importance of the physical point where the mineral reaches the surface when it specified that, for surface mines, the mouth of the mine is "the top of the ramp where the road or conveying system leaves the pit." "Ramp" is defined as "a sloping floor or walk leading from one level to another." *Webster's New Third Int'l Dictionary* 1879 (2002). Reading the two sentences together, it is clear that the ramp rises out of the pit, the top of the ramp is at the surface, and the surface is the mouth of the mine.

[¶33] Wyodak's concentration on the "active pit" fails to give full effect to the legislature's demarcation of the surface of the ground as the end of the pit and the mouth of the mine. *See Clark v. State ex rel. Dep't of Workforce Servs.,* 2016 WY 89, ¶ 16, 378 P.3d 310, 314-15 (Wyo. 2016) (refusing to accept claimant's interpretation of statutory language that did not give effect to all of the words). There is no indication in the statutory language that the legislature intended to change the mouth of the mine for surface mines from a distinct point on the ground to the end of the "active pit" or the area of active mining, as defined by Wyodak.

[¶34] Wyodak also argues that our interpretation of the mouth of the mine has to be informed by Section 39-14-103(b)(iii) which states that the "mining or production process is deemed completed when the mineral product reaches the mouth of the mine" and further states that "[i]n no event shall the value of the mineral product include any processing functions or operations regardless of where the processing is performed." Processing is defined as

         (vii) "Processing" means crushing, sizing, milling, washing, drying, refining, upgrading, beneficiation, sampling, testing, treating, heating, separating, tailings or reject material

10

disposal, compressing, storing, loading for shipment, transportation from the mouth of the mine to the loadout, transportation to market to the extent included in the price and provided by the producer, processing plant site and post-mouth of mine reclamation, maintenance of facilities and equipment relating to any of the functions stated in this paragraph, and any other function after severance that changes the physical or chemical characteristics or enhances the marketability of the mineral[.]

Section 39-14-101(a)(vii).

[¶35] According to Wyodak, the legislature's exclusion of processing costs from the value of the mineral "reinforces the definition of pit as the active mining area by clarifying the definition of mine mouth – it is located where mining activities end and processing activities begin." It claims that, by locating the mouth of the mine at the I-90 tunnel, the Department improperly included processing costs in the value of the mineral as direct mining costs, which is prohibited by § 39-14-103(b)(iii).

[¶36] Wyodak again ignores other words in the statutory provision. Section 39-14-103(b)(iii) prohibits inclusion of processing costs in the value of the minerals. However, the sentence concludes with: "regardless of where the processing is performed." *Id.* There would be no reason to include that phrase at the end of the sentence if processing always occurs beyond the mouth of the mine. The statutory language does not, therefore, mandate that the mouth of the mine be located before any processing activities.

[¶37] Furthermore, Wyodak's argument that the mouth of the mine has to be located prior to any processing is contradicted by the testimony of its witnesses about processing activities that take place within its own designated active pit. Mr. Coovert testified that crushing and blending are processing functions and, at Wyodak's mine, "some of those processing functions actually occur literally in the pit, very, very close to the [coal] face. Like the primary crushers are in the pit, and the blending is occurring in the pit[.]" Kurt Triscori, Wyodak's engineering superintendent, also testified that the coal was crushed and blended in the pit.

[¶38] Wyodak acknowledges that its primary crusher costs are considered processing costs and assigned to the total direct costs category. So, the processing costs are not included in the value of Wyodak's coal even though they occur prior to the mouth of the mine. This complies with § 39-14-103(b)(iii)'s prohibition on including processing costs in the value of the mineral, "regardless of where the processing is performed." Given crushing and blending are processing functions and they occur within Wyodak's "active pit," its argument that the mouth of the mine must be located prior to any processing is contradicted by its own mining activities and tax history.

11

[¶39] Wyodak also claims the Board did not follow or misinterpreted its earlier decisions by accepting the Department's definition of mouth of the mine. We disagree; the Board's prior decisions are consistent with its decision in this case. The first case discussed by Wyodak is *Matter of Appeal of Triton Coal Co,* SBOE Doc. No. 99-64 (2000). Wyodak asserts the Board adopted the "active pit" concept in that case. Although the Board used the term "active pit" in *Triton*, ¶ 7, its decision was not based on a particular definition of that term.

[¶40] Triton took the position that its mine mouth was at a truck dump approximately 292 feet below the natural land surface. The Board rejected Triton's position and agreed with the Department's location of the mouth of the mine at the point where Triton's conveyor, which transported coal from the truck dump to a secondary crusher, left the pit and intersected the surface of the ground. *Id., ¶¶* 96-98. In support of its decision, the Board in *Triton* quoted *Amax Coal* which stated "all transportation from the face of the coal seam to the elevation of the natural land surface constitutes pre-mine-mouth transportation, and is not deductible." *Id., ¶* 93, quoting *Matter of the Appeal of Amax Coal Company From a Decision of the Department of Revenue*, SBOE Doc. No. 92-198 (1994), affirmed in *Amax Coal West, Inc. v. State Bd. of Equalization,* 896 P.2d 1329 (Wyo. 1995). Therefore, in *Triton* and *Amax,* the Board marked the end of the pit at the surface of the ground and designated it as the mouth of the mine.

[¶41] The Board also relied on the *Matter of Appeal of Kerr-McGee Coal Co.,* SBOE Doc. No. 92-283 (1994). In *Kerr-McGee,* the Board determined that costs incurred in transporting the coal along an un-reclaimed, inactive pit (referred to as "the slot"), which was lower than the surface of the surrounding land, were direct mining costs because the coal had not yet reached the mouth of the mine. *Id., ¶¶* 18-19. Like in the case at bar, the Board expressly rejected the taxpayer's argument that "the transportation distance in the 'slot' should be deductible as transportation costs, leaving as 'pre-mine mouth transportation,' the expense and distance from the coal seam to the lip of the **active pit**." *Id.* (emphasis added). Although the *Kerr-McGee* decision addressed the netback valuation method, it demonstrates the Board's long standing position that the mouth of the mine is where the coal reaches the elevation of the surrounding land not where the "active pit" ends.

[¶42] Wyodak insists that, in a prior appeal—*Wyodak Res. Dev. Corp.,* SBOE Doc. No. 2000-99 (2001), the Board recognized the mouth of its mine was close to the coal face. The Board's decision in that case stated "[t]he 'mouth of the mine' in the South Pit was within the mine itself near where the coal face would have been at the time of mining." *Wyodak,* ¶ 87. That case involved a different pit and a different mine setup, and the issue of whether the mouth of the mine was located at the surface was not addressed. Consequently, the Board's statement that the mouth of the mine was within the mine near the coal face is not definitive as to where to locate the mine mouth in this case.

12

[¶43] The plain language of § 39-14-101(a)(vi) specifies where the mouth of the mine is located. The legislature clearly intended the mouth of the mine to be at the point where the coal reaches the surface of the ground. Wyodak's interpretation of the statutory language as placing the mouth of the mine at a point below the surface where the "active pit" ends is incorrect. The Board properly accepted the Department's interpretation of the statute.[5]

### b. *Wyodak's Calculated Mine Mouth*

[¶44] Wyodak used Mr. Coovert's formula to calculate mine mouths for both benches for each year and used those calculations to amend its returns. Although the formula had never been adopted by the legislature or the Department, Wyodak used it to determine where a truck haul road would reach the surface if it used trucks to haul its coal instead of the conveyor. The calculations were performed by Mr. Triscori.

[¶45] Mr. Triscori testified that he started each calculation by using aerial photographs to determine where the centroid (the calendar year average center) of the coal face of each bench was located. He then applied a working setback distance of 300 feet from the centroid. The setback is the area needed for front end loaders and trucks to operate safely and efficiently while retrieving the coal. Next, he "chose a route that a truck would travel and where that intersected the . . . setback . . . on both benches." The distance between the centroid and where "it intersected the setback" was the "in-pit travel distance, and it also represent[ed] the point at which the toe of the ramp would begin." The toe of the ramp is the start of the truck ramp leading out of the pit. He then used an eight percent grade to calculate how long the ramp had to be to reach an elevation of 4,420 feet. An eight percent grade is the industry standard for an efficient, safe ramp, and the target elevation of 4,420 feet is the elevation of the I-90 tunnel. Using those calculations, he located a mine mouth for each bench at the top of the ramp for each year. The calculated mine mouths were used to determine the direct mining costs and total direct costs for the direct cost ratios used in Wyodak's amended returns.

[¶46] The Board rejected Wyodak's calculated mine mouths. It concluded that "[t]he current statutory valuation methods do not envision hypothetical points of valuation or costs." We agree. The plain language of the statute places the mouth of the mine at a

---

[5] Wyodak argues that legislative history supports its interpretation of the statute. We do not consider legislative history unless the statutory language is ambiguous. *Mathewson v. City of Cheyenne,* 2003 WY 10, ¶ 6, 61 P.3d 1229, 1232 (Wyo. 2003). In addition, we note that, while some of Wyodak's legislative history evidence may have been appropriate to construe an ambiguous statute, other aspects of its evidence clearly were not. Mr. Coovert testified at length about his participation, as a mine industry representative, in the legislative process that led to the adoption of the proportionate profits valuation methodology and his view of the legislature's intent in passing the statutes. Given we have said that the subjective intent of any particular legislator is not appropriate evidence of legislative intent, *Mountain Cement Co. v. South of Laramie Water & Sewer Dist.,* 2011 WY 81, ¶ 55, n. 12, 255 P.3d 881, 902, n. 12 (Wyo. 2011), the subjective intent of a lobbyist certainly would not be.

13

physical location. If the legislature had intended for the mine mouth to be located at a hypothetical point without any reference to the mining and transportation systems actually used by the taxpayer, it would have said so and provided a method to calculate the mouth of the mine.

[¶47] In *Hillard v. Big Horn Coal Co.,* 549 P.2d 293 (Wyo. 1976) and *State Bd. of Equalization v. Monolith Portland Midwest Co.,* 574 P.2d 757 (Wyo. 1978), we emphasized the importance of establishing the value of minerals based upon the taxpayer's true circumstances. Although these cases were decided prior to the legislature's adoption of the proportionate profit valuation method in 1990, they demonstrate that the valuation of minerals in Wyoming is based on actual, not hypothetical, factors. We said in *Hillard,* 549 P.2d at 301, that the actual royalty, rather than "an artificial amount" must be used as a cost in valuing coal for taxation. Similarly, in *Monolith,* 574 P.2d at 760-61, we rejected the Department's use of presumed costs of transporting Monolith's minerals to a hypothetical storage facility in valuing its mineral production.

[¶48] Wyodak insists its calculated mine mouths are not hypothetical because they were determined by examining aerial photographs and maps of the mine and using engineering calculations. We disagree. There are no ramps that exit the Wyodak pit at the calculated mine mouths; there are no trucks that haul the coal to the surface; there are no drivers who operate the trucks; and Wyodak does not incur the costs associated with the fictional ramps and haul roads. Like in *Monolith*, Wyodak's calculations are based upon circumstances that do not exist.

[¶49] Wyodak asserts that its calculations are acceptable even though the actual conditions do not exist because other mines use similar procedures to determine the mouth of the mine. Craig Grenvik, the Department's Mineral Tax Division Administrator, testified at the hearing. He agreed that other mines use topographical maps and engineering calculations to determine their points of valuation for the year. However, he pointed out an important distinction between those situations and Wyodak's:

> Q [by Wyodak's counsel]. [S]o the fact that Mr. Triscori has done this [used engineering calculations to establish the mouth of the mine], there's nothing unique about really what he's done at all, is there?
> A. It's unique in the fact that he isn't basing the calculations upon a known point. He's making calculations to determine a point.

14

[¶50] Mr. Grenvik also testified that by using a hypothetical ramp with hypothetical trucks, Wyodak's calculations avoid many real-world situations such as haul roads that are not perfectly straight or are longer than Wyodak's calculated road because of circumstances on the ground. The calculated mine mouths also avoid the difficulties and costs associated with actually moving the ramp and haul road as the coal face moves. Wyodak would just perform new calculations as its mine moved, unlike other mine operators who have to actually construct new ramps and sections of the haul road.

[¶51] The Board correctly upheld the Department's rejection of Wyodak's amended returns modifying the location of its mine mouth. The record contains substantial evidence to support the Board's factual findings about Wyodak's mine and calculations, and the Board's interpretation of the pertinent statutory language is in accordance with the law.

### 3. *Constitutional Principles of Uniformity and Equality in Taxation*

[¶52] Wyodak claims the Board's decision violates the Wyoming Constitution's requirements of uniformity and equality in taxation. Wyo. Const. art. 15, § 11 states in relevant part:

> (a) All property, except as in this constitution otherwise provided, shall be uniformly valued at its full value as defined by the legislature, in three (3) classes as follows:
>
> (i)     Gross production of minerals and mine products in lieu of taxes on the land where produced[.] . . .
>
> (d) All taxation shall be equal and uniform within each class of property. The legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal.

The constitution does not require that all minerals of like kind be assessed the same. "Uniformity of assessment requires only that the method of appraisal be consistently applied." *Monolith,* 574 P.2d at 761. *See also Hillard,* 549 P.2d at 300-01.

[¶53] The crux of Wyodak's argument is that the location of the mouth of the mine at the I-90 tunnel shackles it with a permanent mine mouth, so that, as the coal face moves northward, it amasses higher direct mining costs. It claims the permanent mine mouth results in non-uniform taxation because mines with traditional truck haul systems get to move their mine mouths by moving their ramps.

[¶54] The Board ruled that Wyodak's constitutional right to uniform and equal taxation was not violated by the Department's decision. Mr. Grenvik's testimony supports the Board's determination. He explained that the Department consistently applies the statutory language to determine the mouth of the mine for Wyoming coal mines. It sets the mouth of the mine at the surface of the ground and relies on the actual mine conditions in locating it. Mr. Grenvik testified that if the Department allowed Wyodak to use its calculated mine mouths based upon hypothetical conditions, it would actually be treating it differently than other mines. If that were to happen, the Department would be required to let other mines calculate a hypothetical mine mouth closer to the coal face even if they chose to avoid the cost and inconvenience associated with actually moving the ramp when the coal face advanced. Mr. Coovert conceded this possibility. He testified that the ramp for the trucks hauling Wyodak's coal to the train loadout is "way too far from the pit" and the cost of relocating it is prohibitive, so Wyodak could have calculated a mouth of the mine closer to the coal face, but decided against it.

[¶55] The Board concluded that Wyodak's fixed mine mouth is due to its own business decisions.

> 110. If Wyodak is the only mine in the Powder River Basin with a permanent mine mouth location for the life of its pit, that is the result of its business choice to rely on a conveyor system through a transportation corridor it has not reclaimed. In other words, Wyodak's permanent mine mouth is the result of Wyodak's business decision and mine plan, not the result of the Department's failure to consistently apply the tax valuation statutes.

Wyodak acknowledged that it chose the conveyor system for its economic benefits over a truck haul system. The consequences of that choice were a more favorable cost structure and a less favorable tax situation.

[¶56] The testimony at the hearing and the Board's prior decisions demonstrate that the Department has consistently applied the statute to locate Wyoming mine mouths at the point where the minerals actually reach the surface. Although it has negative tax consequences for Wyodak, application of the statutory definition to its chosen situation does not violate its constitutional right to uniform and equal taxation. The Department, the Board and this Court are obligated to follow the statutes as written. If Wyodak wants to alter its tax situation, it can either change its mining practice or attempt to convince the legislature to enact an amendment.

## 4. *Environmental and Government-Imposed Costs*

16

[¶57]   The Board upheld the Department's rejection of Wyodak's amended returns which attempted to classify its environmental and government-imposed costs, including the costs of water and air quality testing, wildlife monitoring, weed control and aerial photography, as indirect instead of direct costs.   Section 39-14-103(b)(vii)(D) defines indirect costs:

> Indirect costs include but are not limited to allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically attributed to an operational function without allocation.

*Id.*   The effect of the reclassification of the costs from direct to indirect would be to remove them from the direct cost ratio.  *Id.*

[¶58]   The Board disagreed with Wyodak in principal, stating that the environmental  and government-imposed costs were not similar to the indirect costs specifically identified in § 39-14-103(b)(vii)(D) and were related to direct mining functions.   It, therefore, concluded that the Department properly rejected Wyodak's reclassification of the expenses as indirect costs.  However, the Board also stated:

> 104.   The parties recognized during the hearing that the [Department of Audit (DOA)] was performing an audit to analyze the exact nature of the costs and their possible allocations.  When the audit is complete[] and the Department issues its final determination based upon the DOA audit findings, Wyodak may appeal that final determination.   If Wyodak and the Department cannot come to an agreement on the manner in which to treat these expenses following the results of the audit, Wyodak may come before the [Board] again, and the [Board] will explore those issues at that time with a more fully developed record.

[¶59]   The deficiency of the record is clear from the hearing testimony.  Mr. Coovert testified that the actual source documents, including the invoices associated with the claimed costs, were not submitted with the amended tax returns, but they would be examined during the audit.[6]  Mr. Grenvik testified that the Department had not had the opportunity to examine the source documents such as the general ledger account, cost allocation worksheets, payments to the federal government and actual invoices, but that the DOA would examine that information during the audit.   He agreed that the

---

[6] Although this information is not part of the record on appeal, the Department stated in its brief and at oral argument that the audit was completed while this appeal was pending and "[t]he resultant Department tax assessment is currently under appeal before the Board."

17

Department reserved "the right to be persuaded" by Wyodak's evidence they were not direct mining costs.

[¶60]  Under Wyo. Stat. Ann. § 16-3-114(a) (Lexis Nexis 2015), a person aggrieved or adversely affected by a final agency decision after a contested case hearing may seek judicial review of the decision.

> "An aggrieved or adversely affected person is one who has a legally recognizable interest in that which will be affected by the action. A potential litigant must show injury or potential injury by 'alleg[ing] a perceptible, rather than a speculative, harm resulting from the agency action.' ' "The interest which will sustain a right to appeal must generally be substantial, immediate, and pecuniary. A future, contingent, or merely speculative interest is ordinarily not sufficient." '

*Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2004 WY 136, ¶ 7, 100 P.3d 848, 850 (Wyo. 2004) (citations omitted).

[¶61]  The Board's decision upheld the Department's rejection of Wyodak's amended tax returns reclassifying the environmental and government-imposed expenses as indirect costs.  However, it expressly recognized that its decision was not a final ruling on the costs.  The Department reserved the right to be persuaded by Wyodak that its costs were not direct mining costs, and the Board stated it would revisit the exact same costs in the event that Wyodak was not satisfied with the audit results.  These circumstances demonstrate that Wyodak did not suffer a substantial, immediate and pecuniary harm as a result of the Board's decision.  *See Douglass v. Wyo. Dep't of Transp.,* 2008 WY 77, ¶ 19, 187 P.3d 850, 854-55 (Wyo. 2008) (email from the appellant's supervisor notifying him that another agency had denied his request for a salary increase, but also stating that the supervisor would "continue to look at the issue and wanted to discuss it further" was not a final agency decision).

[¶62]  *Merit Energy Co. v. Dep't of Rev.,* 2013 WY 145, 313 P.3d 1257 (Wyo. 2013) addressed a similar issue, though at a different level of review.  The question in that case was whether the Department's notices of assessment were final administrative decisions subject to appeal to the Board.  The taxpayer argued that the decisions were not final because it could have filed an amended return or an audit could have been performed.  However, the facts were that the taxpayer had not filed an amended return and no audit had been commenced.  We ruled that, in the absence of the additional proceedings, the Department decision was final.  *Id.,* ¶ 25, 313 P.3d at 1262.  The opposite happened here–the costs were under audit and the parties recognized that the categorization of the costs could change based upon the audit result.  Under the specific circumstances of this case, the Board's decision on the environmental and government-imposed costs was not final.

[¶63]  The ripeness doctrine also applies to these circumstances.

> The ripeness doctrine is a category of justiciability "developed to identify appropriate occasions for judicial action." 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3529, p. 146 (1975). The basic rationale of the ripeness requirement, like that of the justiciability requirement,
> " * * * is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

*Jacobs,* ¶ 8, 100 P.3d at 850-51, quoting *Industrial Siting Council of State of Wyo. v. Chicago & North Western Transp. Co.,* 660 P.2d 776, 779 (Wyo. 1983).

[¶64]  In the first part of the ripeness analysis, we consider the fitness of the issue for judicial decision.  The Board recognized that its ruling on this issue was made without a complete record which would be forthcoming as part of the audit.  It also stated that "the exact nature of the costs and their possible allocations" was directly at issue in the audit and it would explore the issue in a future proceeding if Wyodak was not satisfied with the audit results.  If we were to decide this issue now, this Court would be entangling itself in the agency's decision-making and interfering with its efforts to make a final decision on the proper classification of the expenses based upon a complete record.  The question of the proper classification of the costs, therefore, is not fit for judicial decision at this time.

[¶65]  The second part of the ripeness analysis examines the hardship to the parties from withholding a decision at this time.  We see no such hardship.  The parties are addressing the issue as part of the audit and will, in fact, benefit from a decision to withhold review at this time so that the factual record can be developed and the agency can make a fully informed decision.  Under these circumstances, we conclude the issue of whether the Department properly classified the environmental and government-imposed expenses is not ripe for review.  *See Seckman v. Wyo-Ben, Inc.,* 783 P.2d 161 (Wyo. 1989) (issue of whether injured employee was entitled to a higher grade prosthetic device was not ripe for review because the parties agreed he would be evaluated in the future and his request

19

would be treated as a new claim which then could be reviewed through the administrative process).

**CONCLUSION**

[¶66]   The plain language of § 39-14-101(a)(vi) places the mouth of the mine at the point where the mineral reaches the surface of the ground.  The Board properly concluded that Wyodak's calculated mine mouths were hypothetical and did not comply with Wyoming law.  The Department applies the statutory definition of mouth of the mine consistently, and Wyodak was not subjected to unequal or non-uniform taxation when the Department applied the statute to its true mine configuration.  Additionally, the Board did not finally determine whether Wyodak's environmental and government-imposed costs are direct or indirect costs and the issue is not ripe for review because the exact same costs, with a more complete factual record, are subject to review in the audit process.

[¶67]   Affirmed.