# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 38

### OCTOBER TERM, A.D. 2019

### March 18, 2020

ECOCARDS, a Wyoming corporation,

Appellant
(Plaintiff),

v.

S-19-0190

TEKSTIR, INC., a Delaware corporation,

Appellee
(Defendant).

*Appeal from the District Court of Teton County*
The Honorable Timothy C. Day, Judge

*Representing Appellant:*
Richard R. Thomas and Vonde M. Smith, Smith LC, Jackson, Wyoming.

*Representing Appellee:*
No appearance.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    Ecocards sued Tekstir, Inc. for failing to perform under a website development agreement.  The district court determined Teton County, Wyoming, was not the proper venue for Ecocards' suit and granted Tekstir's[1] motion to dismiss the action.  The court relied upon a forum selection clause in the parties' Master Services Agreement (MSA) which required any claim or suit arising under the agreement to be litigated in Orange County, California.  Ecocards claims the district court improperly resolved disputed issues of fact in determining the MSA (with its forum selection clause) was a valid contract.  We conclude the district court did not decide any material issues of fact and the MSA governs the parties' relationship.  The district court did not abuse its discretion by dismissing the case for improper venue.

[¶2]    We affirm.

## ISSUE

[¶3]    The issue on appeal is:  Did the district court abuse its discretion in granting Tekstir's motion to dismiss for improper venue?

## FACTS

[¶4]    Rebecca Bextel developed a business concept "of an on-line greeting card company that also provided access to non-profit companies to which customers . . . could make financial contributions."   She initially called her business "Charity Mail," but never organized as a business entity under that name.  She later formed Ecocards as a Wyoming corporation, with its principal place of business in Teton County, Wyoming.  Although the documents we will discuss herein refer variously to Charity Mail, Ms. Bextel, and Ecocards, Ecocards does not claim it is not the correct party or that it is not bound because the agreements used the other names.  For ease of reference, we will refer to the business as Ecocards.

[¶5]    In January 2018, Ms. Bextel contacted Tekstir about developing a website for Ecocards.  Greg Dawson, a principal and officer of Tekstir, was primarily responsible for negotiating with Ms. Bextel.  On February 3, 2018, Ms. Bextel signed an agreement with Tekstir.  Under the agreement, Tekstir would build a website, including a home page and three to five content pages, for Ecocards to show to potential investors.  Ms. Bextel said she paid a total of $10,000 for this work, including a $5,000 "initial payment followed by an additional $5,000 payment."[2]

---

[1] Tekstir did not appear in this appeal.
[2] The agreement for the initial work indicates she was to pay a total of $5,000.  This apparent discrepancy regarding the amount of payment is not material to our decision.

1

[¶6]    During this same time, the parties were negotiating the MSA and an agreement for a fully functional website.  On January 30, 2018, Mr. Dawson emailed a draft of the MSA to Ms. Bextel.  He said he had modified the agreement to "address the key issues we discussed."  He also said that, although Tekstir could proceed with the initial work without having the MSA in place, it would have to be finalized before the parties signed "a further development agreement."

[¶7]    On Friday, March 16, 2018, Ms. Bextel signed the MSA, which stated it was effective that day, and emailed it to Mr. Dawson.  The record contains a fully executed copy of the MSA, showing Mr. Dawson signed the agreement when he received it from Ms. Bextel on March 16, 2018.  The MSA set out the general terms for Tekstir to create various programs and internet applications for Ecocards.  For specific projects, the MSA stated that Tekstir would perform the services "described in[,] and in accordance with[,] one or more written statements of services (each, an 'Exhibit' and/or a 'SOW') to be entered into by the parties and attached to this Agreement."  Mr. Dawson stated in his affidavit that "SOW" means "scope of work."  The MSA included an initial term, commencing on the effective date and continuing "until the later of (a) twelve calendar months; and (b) the date of expiration or termination of the last-to-survive Exhibit hereunder."  Following the initial term, the MSA would renew automatically for successive twelve-month terms.  However, after the initial term, either party could terminate the MSA "by providing the other with at least sixty (60) calendar day[s] written notice of termination."  Under the general terms section of the MSA, the agreement could not be "amended or modified except by a written instrument signed by both parties."  It also provided that "[e]xclusive venue for any claim or suit arising hereunder shall be in Orange County, California."

[¶8]    The initial specific project was described in an attachment to the MSA:  "Exhibit A – SOW 101159."  It stated Tekstir would provide a "4 month build" of "Version 1 including Web Portal and App, Backend Admin Portal, iOS and Android Apps."  The total cost of this work was $28,200, but only $23,200 was "due on signing because we deduct $5,000 paid for web site[.]"

[¶9]    On Sunday, March 18, 2018, two days after signing and delivering the MSA, Ms. Bextel sent an email to Mr. Dawson stating she could not pay for Tekstir's services at that time.  "The same day or the day after," Mr. Dawson called her to discuss the email.  He told her "not to worry" and to "let him know if [she] decided to move forward."  Over the next few months, the parties discussed ways to modify the project and pay for it.  On June 5, 2018, they agreed Tekstir would develop a website and mobile apps for Ecocards in exchange for a cash payment and a ten percent equity interest in Ecocards.  This agreement is referred to in the record as the "website development agreement."  On June 15, 2018, Tekstir advised Ecocards it had resumed working on its project.

2

[¶10] Ecocards filed this action in the Teton County district court on January 7, 2019, claiming Tekstir failed to "adequately perform its obligations under the website development agreement." Ecocards also requested a judgment declaring the equity agreement unenforceable. Tekstir filed a motion to dismiss under Wyoming Rule of Civil Procedure 12(b)(3)[3] because, under the MSA's forum selection clause, venue in Teton County, Wyoming, was improper. The parties filed additional materials, affidavits and declarations addressing the venue issue. After a hearing, the district court granted Tekstir's motion to dismiss for improper venue. Ecocards appealed.

## STANDARD OF REVIEW

[¶11] We generally review a district court's rulings regarding venue for abuse of discretion. *Saunders v. Saunders,* 2019 WY 82, ¶ 10, 445 P.3d 991, 996 (Wyo. 2019); *Bourke v. Grey Wolf Drilling Co.,* 2013 WY 93, ¶ 14, 305 P.3d 1164, 1167 (Wyo. 2013).

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

*Burnham v. Coffinberry,* 2003 WY 109, ¶ 5, 76 P.3d 296, 298 (Wyo. 2003). To the extent we are required to address legal issues to resolve this case, our review is de novo. *Saunders,* ¶ 10, 445 P.3d at 996 (citing *BTU W. Res., Inc. v. Berenergy Corp.,* 2019 WY 57, ¶ 14, 442 P.3d 50, 54-55 (Wyo. 2019)).

[¶12] In determining whether a case should be dismissed for improper venue under Rule 12(b)(3), the court generally accepts the well-pleaded allegations in the plaintiff's complaint as true. *Saunders,* ¶ 11, 445 P.3d at 996 (citing *Espinoza v. Evergreen Helicopters, Inc.,* 376 P.3d 960, 982 (Or. 2016)); 5B Fed. Prac. & Proc. Civ. § 1352 (3d. ed. 2019) (discussing identical federal rule). The court must also draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff. *Id.* However, the court may examine the defendant's affidavits or declarations which contradict the facts stated in the complaint regarding venue. *Id. See also, Hancock v. Am. Tel. and Tel. Co., Inc.,* 701 F.3d 1248, 1260-61 (10th Cir. 2012) (quoting *Pierce v. Shorty Small's of Branson Inc.,* 137 F.3d 1190, 1192 (10th Cir. 1998)) ("[A] plaintiff may rest on the well-pled facts in the

---

[3] Rule 12(b)(3) states:

> (b) *How to Present Defenses*. – Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:
>
> . . . .
>   (3) improper venue[.]

3

complaint to oppose a motion to dismiss for improper venue, but only to the extent that such facts are uncontroverted by defendant's evidence." (internal quotation marks omitted)).

[¶13]  If there are disputed issues of fact regarding venue, the district court may, in its discretion, hold an evidentiary hearing to resolve the Rule 12(b)(3) motion. *Brooks Range Petroleum Corp. v. Shearer,* 425 P.3d 65, 71 (Alaska 2018); *Hancock,* 701 F.3d at 1261; *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1139-40 (9ᵗʰ Cir. 2004).  "Upon holding an evidentiary hearing to resolve material disputed facts, the district court may weigh evidence, assess credibility, and make findings of fact that are dispositive on the Rule 12(b)(3) motion.  These factual findings, when based upon an evidentiary hearing and . . . disputed material issues, will be entitled to deference." *Murphy,* 362 F.3d at 1140.

## DISCUSSION

[¶14]  Ecocards asserts the district court should not have dismissed its case based upon the forum selection clause in the MSA.  It claims there are disputed issues of material fact as to whether the MSA and its associated forum selection clause are valid and a jury should decide those issues.  We conclude there are no issues of material fact.  Furthermore, in accordance with the legal principles recited above, the court, not a jury, would decide any issues of fact regarding a Rule 12(b)(3) motion to dismiss.[4]

### *Validity of the MSA*

[¶15]  Ecocards asserts that its relationship with Tekstir is governed only by the website development agreement (which does not include a forum selection clause).  It claims it presented credible evidence, through Ms. Bextel's declaration and evidence of the parties' communications, showing there are factual questions as to whether the MSA is a valid contract, including:

- The MSA was one of many drafts of possible agreements that Ecocards exchanged with Tekstir.

- On March 16, 2018, Ms. Bextel, acting on behalf of Ecocards, signed the MSA and sent it to Mr. Dawson, a representative of Tekstir.

- However, the very next day, on March 17, 2018, Ms. Bextel sent an email to Mr.

---

[4] Ecocards cites *Matuszevoska v. Princess Cruise Lines, Ltd.,* 2007 WL 9701120 (S.D. Fla. 2007), as authority for its contention that factual issues regarding venue under Rule 12(b)(3) should be decided by a jury rather than the court on a motion to dismiss.  The federal district court in that case denied a motion to dismiss because there were factual issues surrounding enforcement of a forum selection clause. *Id.* at 1, 4. It did not, however, state that those issues should be decided by a jury.  Such a holding would clearly be contrary to the authorities discussed herein.

4

Dawson to let him know that she did not want to go forward with the MSA with Tekstir. Her intent in doing this was to cancel and revoke her signature on the MSA such that neither Tekstir nor Ecocards would have any obligations under the MSA.

- That same day, or the very next day, Mr. Dawson called Ms. Bextel to discuss the email and her desire not to go forward with the MSA at that point in time. Mr. Dawson told Ms. Bextel not to worry and to let him know if she decided to move forward with Tekstir at some future point in time.

- At no point during Ms. Bextel's conversation with Mr. Dawson did he represent that he had already signed the MSA. At no time did anyone from Tekstir ever send Ms. Bextel a fully executed version of the MSA with both her signature and Mr. Dawson's signature.

- Immediately after hanging up the phone with Mr. Dawson, Ms. Bextel felt relief that no one had signed and returned the MSA to her and her understanding was that no agreement existed between Ecocards and Tekstir except the agreement for the three to five page website for investors.

- Tekstir ceased all work on the website project and did not resume any work on it until Ms. Bextel and Mr. Dawson negotiated and agreed to terms for the project.

- Throughout April, May, and June 2018, Ms. Bextel continued to negotiate terms with Mr. Dawson and other Tekstir representatives until, ultimately, they agreed to the terms set forth in the website development agreement. Ms. Bextel signed the website development agreement and mailed it to Tekstir with an $8,000.00 check on June 5, 2018. At no time during these negotiations did Mr. Dawson or anyone from Tekstir raise an issue about the MSA.

- On June 15, 2018, just ten days after Ms. Bextel signed and mailed the website development agreement with payment to Tekstir, Mr. Dawson wrote to let her know Tekstir had re-started the website project. At that time, Mr. Dawson made no mention of the MSA or its terms.

- It is and was Ms. Bextel's express intention that the website development agreement govern the relationship between Ecocards and Tekstir. Based upon the course of dealings between Ms. Bextel and Tekstir, she believes Tekstir understood the same thing.

These alleged factual questions can be distilled into three arguments: 1) the MSA was not a valid contract; 2) the MSA was replaced by the website development agreement; and 3)

5

Ecocards, through Ms. Bextel, revoked or rescinded its consent to the MSA. We will address each of these arguments in turn.[5]

[¶16] Ecocards claims the MSA was not a valid contract because it was just one of many draft agreements it exchanged with Tekstir. Although there is evidence in the record showing the parties exchanged drafts of the MSA, there is also a copy of the MSA that was fully executed on March 16, 2018, effective that day. The signed MSA has all the elements of a valid contract -- offer, acceptance and consideration. *Finch v. Farmers Co-op Oil Co.,* 2005 WY 41, ¶ 11, 109 P.3d 537, 541 (Wyo. 2005); *McLean v. Hyland Enters., Inc.,* 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001). Ecocards claims it did not receive a copy of the agreement after Tekstir executed it; however, it does not dispute the authenticity of the fully executed document. The fact that the parties exchanged drafts while negotiating the terms of the agreement is not remarkable and does not change the fact that they executed the final version of the MSA.

[¶17] Despite the signed MSA, Ecocards argues the website development agreement was the only contract between the parties. This argument ignores the plain language of the MSA which clearly states it was meant to work together with supplemental agreements like the website development agreement.

[¶18] We interpret unambiguous contracts as a matter of law. *Fix v. Forelle,* 2014 WY 79, ¶ 16, 327 P.3d 745, 749 (Wyo. 2014) (citing *Fayard v. Design Comm. of Homestead Subdivision,* 2010 WY 51, ¶ 12, 230 P.3d 299, 303 (Wyo. 2010)). Consequently, we review the district court's interpretation of the contract de novo. *Finley Res., Inc. v. EP Energy E&P Co., L.P.,* 2019 WY 65, ¶ 7, 443 P.3d 838, 842 (Wyo. 2019).

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate.

---

[5] Although neither the parties nor the district court mention it, the MSA contains the following choice-of-law clause: "This Agreement, including any Exhibit made a part hereof, shall be governed and construed in accordance with the laws of the State of California[.]" That provision raises the question of whether we should apply California law or Wyoming law to determine whether the MSA is valid. The Tenth Circuit in *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.,* 439 F.3d 653, 661 n.9 (10th Cir. 2006), recognized there is a "logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid." We agree. Therefore, we will apply Wyoming law to determine whether the MSA is a valid contract.

*Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (quoting *Hunter v. Reece,* 2011 WY 97, ¶ 17, 253 P.3d 497, 502 (Wyo. 2011) (other citations omitted)). *See also, Schell v. Scallon,* 2019 WY 11, ¶ 16, 433 P.3d 879, 885 (Wyo. 2019); *Thornock v. PacifiCorp,* 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016) (giving effect to the parties' intent as found in the plain terms of the contract).

[¶19]   The MSA is clear and unambiguous.  It provided general terms for the relationship between Tekstir and Ecocards.  It addressed matters such as how Tekstir's services would be defined, how Ecocards would pay Tekstir, methods of termination, amendment and modification of the agreement, confidentiality of business information, proprietary rights, indemnification and limitations of liability.  The MSA stated Tekstir's specific services to Ecocards would be described in written statements of services, separately entered into by the parties and incorporated as part of the agreement.  The website development agreement included a written statement of specific services Tekstir would provide to Ecocards and described the consideration Ecocards would give in return for those services (cash and equity in the company).  The website development agreement did not include the other terms addressed by the MSA.  The plain language of the MSA and the website development agreement shows they were intended to work together.  The MSA established the over-all agreement between the parties, and the website development agreement provided specifics about work to be performed.  There is no indication the website development agreement supplanted the MSA.[6]

[¶20]   Ecocards also asserts Ms. Bextel sent an email the day after she signed the MSA intending to "cancel and revoke her signature on the [MSA] such that neither Tekstir nor [Ecocards] would have any obligations arising under the [MSA]."  The email included in the record was actually sent on Sunday, March 18, 2018, two days after Ms. Bextel signed the MSA.  It stated, in relevant part:

> I know I signed the contract Friday[,] but I cannot pay you yet. My husband has just had a real talk with me[,] and I have not technically raised a penny for this project yet.  . . .   [I]t's not a good idea for me to drain my personal savings of $23,000 when I haven't technically got one investor.
>
> I am going to move forward with this project as soon as I raise the money.

---

[6] As the district court noted, the website development agreement Ecocards attached to the complaint and claims is the parties' only effective contract was labeled as a proposal and was not dated or executed by either party.  We need not decide whether the website development agreement is enforceable because we are concerned only with the validity of the MSA and its forum selection clause.

7

[¶21]   It is basic contract law that, once a valid unconditional contract is entered into, the parties are bound by their agreement and one party cannot unilaterally revoke or rescind it. *Whitlock Const., Inc. v. South Big Horn Cnty. Water Supply Jt. Powers Bd.,* 2002 WY 36, ¶¶ 17-18, 41 P.3d 1261, 1266 (Wyo. 2002) (discussing *Robert W. Anderson Housewrecking & Excavating, Inc. v. Bd. of Trustees, School Dist. No. 25, Fremont Cnty.,* 681 P.2d 1326, 1331-32 (Wyo. 1984)).  Williston on Contracts § 5:8 (4th ed. 2019) states the basic concept:

> [I]f a definite offer has been made and accepted without qualification, the completed contract thus arrived at cannot be affected by subsequent negotiations unless they amount to an agreement to modify or rescind the contract.

[¶22]   Given the fully executed MSA included all the elements of a contract (offer, acceptance and consideration) and stated it became effective on the date of execution (March 16, 2018), Ms. Bextel's email was too late to avoid creating a contract.  By its own terms, the MSA "may not be amended or modified except by a written instrument signed by both parties."  The MSA also provides means for termination of the agreement.  The record contains no evidence of a written amendment or modification to the MSA or Ecocards' compliance with the requirements for termination.

[¶23]   Ecocards asserts Ms. Bextel's belief that her email revoked her assent to the MSA creates an issue of fact about the validity of the MSA.  She stated in her declaration in opposition to Tekstir's motion to dismiss that she spoke with Mr. Dawson about her March 18 email and he told her "not to worry" and "to let him know if [she] decided to move forward with Tekstir at some future time."  Ms. Bextel stated Mr. Dawson did not mention during their conversation that he had already signed the MSA.  After the call concluded, she "felt relieved" that the MSA was not a valid agreement, and it was her express intention that the website development agreement govern Ecocards' relationship with Tekstir.  We follow an objective approach to contract interpretation; evidence of a party's subjective intent is not admissible.  *Ultra Res., Inc. v. Hartman,* 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo. 2010) (citing *Omohundro v. Sullivan,* 2009 WY 38, ¶ 24, 202 P.3d 1077, 1084-85 (Wyo. 2009)).  The fully executed MSA, without any evidence of appropriate action by the parties to modify or terminate it, cannot be defeated by evidence of Ms. Bextel's subjective intent not to be bound by it.

[¶24]   Furthermore, Ms. Bextel's email cannot reasonably be interpreted to mean Ecocards was not, or did not wish to be, bound by the MSA.  Ms. Bextel simply said she could not pay Tekstir at that time but would move forward with the project as soon as she raised the money.  Mr. Dawson agreed not to require her to pay at that time and stated Tekstir would resume work on the project when she was ready.  Nothing in that exchange evidenced an intent by either party to revoke or terminate the MSA.  Additionally, the MSA states that a party's waiver of a condition or covenant of the agreement will not be construed as a waiver

of other breaches. Under that provision, Tekstir's agreement to wait for payment from Ecocards did not mean it was waiving its other rights under the MSA.

[¶25] Ecocards has not presented any facts showing a genuine dispute as to the validity of the MSA. Like the district court, we conclude the MSA is an enforceable contract.

### *Forum Selection Clause*

[¶26] The forum selection clause in the MSA stated: "Exclusive venue for any claim or suit arising hereunder shall be in Orange County, California." Because we have determined the MSA is valid and Ecocards does not challenge the choice-of-law provision contained therein, *see* footnote 5, *supra*, California law applies to the question of whether the forum selection clause is enforceable. *See Finley,* ¶ 9, 443 P.3d at 842 (applying the parties' chosen law to determine whether the forum selection clause governed the action). *See also, Yavuz v. 61 MM, Ltd.,* 465 F.3d 418, 428 (10th Cir. 2006) ("[W]hen the contract contains a choice-of-law clause, a court can effectuate the parties' agreement concerning the forum only if it interprets the forum [selection] clause under the chosen law."). Even so, California law on this issue is not materially different than Wyoming law.

[¶27] "California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be unreasonable" or unfair. *Verdugo v. Alliantgroup, L.P.,* 187 Cal.Rptr.3d 613, 617-18 (Cal. Ct. App. 2015) (internal quotation marks and citations omitted). *See also, Lu v. Dry-clean U.S.A. of Cal., Inc.,* 14 Cal.Rptr.2d 906, 907 (Cal. Ct. App. 1992) (a party seeking to avoid application of a forum selection clause has a heavy burden and must demonstrate enforcement of the clause would be unreasonable); *Durdahl v. Nat'l Safety Associates, Inc.,* 988 P.2d 525, 528 (Wyo. 1999) ("[F]orum selection clauses are *prima facie* valid and will be enforced absent a demonstration by the party opposing enforcement that the clause is unreasonable or based upon fraud or unequal bargaining positions."). A forum selection clause "is reasonable if it has a logical connection with at least one of the parties or their transaction." *Verdugo,* 187 Cal.Rptr.3d at 618. *See also, Am. Online, Inc. v. Superior Court,* 108 Cal.Rptr.2d 699, 707 (Cal. Ct. App. 2001) (the place chosen in a forum selection clause must have some logical nexus to one of the parties or the dispute). *See generally, Venard v. Jackson Hole Paragliding, LLC,* 2013 WY 8, ¶ 8, 292 P.3d 165, 168 (Wyo. 2013) (in refusing to enforce a forum selection clause, this Court noted the record did not show the parties or the dispute were in any way connected with the chosen state). Forum selection clauses are also unenforceable if they violate the public policy of the state where the suit was brought. *Verdugo,* 187 Cal.Rptr.3d at 618 (citing *Am. Online, Inc.,* 108 Cal.Rptr.2d at 708); *Finley,* ¶ 24, 443 P.3d at 846 (citing *Nuhome Invs., LLC v. Weller*, 2003 WY 171, ¶ 8, 81 P.3d 940, 944 (Wyo. 2003)).

[¶28] Ecocards makes no argument that the forum selection clause in the MSA was not entered into voluntarily and freely. It also does not claim the clause is unreasonable, unfair,

the result of fraud by Tekstir or unequal bargaining positions, or that its enforcement would violate Wyoming public policy. Furthermore, the State of California clearly has a connection to the parties and the dispute. The agreements and correspondence between Ecocards and Tekstir showed Tekstir's California address and that Ms. Bextel met Tekstir representatives in California on at least one occasion. There is nothing in the record which would prohibit enforcement of the forum selection clause.

## CONCLUSION

[¶29] The MSA, including the clause selecting Orange County, California, as the exclusive venue for all claims and disputes arising under it, effectively binds Ecocards and Tekstir. The district court did not abuse its discretion when it dismissed Ecocards' complaint against Tekstir for improper venue.

[¶30] Affirmed.