# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 155

OCTOBER TERM, A.D. 2020

December 18, 2020

RICK MILLER, appointed Wrongful
Death Representative for the Estate of
Julia Faye Miller, deceased,

Petitioner,

v.

S-20-0076

LIFE CARE CENTERS OF AMERICA,
INC., a foreign corporation and
CASPER OPERATIONS, LLC, a
foreign LLC, d/b/a LIFE CARE
CENTER OF CASPER,

Respondents.

*Appeal from the District Court of Natrona County*
The Honorable Catherine E. Wilking, Judge

*Representing Petitioner:*
> Diana Rhodes, Tracy Rivinus, Lori Brand of Rhodes Law Firm, LLC, Cheyenne, Wyoming. Argument by Ms. Brand.

*Representing Respondents:*
> Lena K. Moeller and Amy M. Iberlin of Williams, Porter, Day, and Neville, P.C., Casper, Wyoming. Argument by Ms. Iberlin.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

---

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    Rick Miller (Rick) signed a "Voluntary Agreement for Arbitration" (Arbitration Agreement or Agreement) on behalf of his mother, Julia Faye Miller (Julia), shortly after she was admitted to Life Care Center of Casper (LCCC).  Following her death, Rick, as wrongful death representative of Julia's estate, filed a civil action against Life Care Centers of America, Inc. and Casper Operations, LLC d/b/a Life Care Center of Casper (collectively Life Care).  Life Care filed a motion to compel arbitration under the Agreement.  The district court granted Life Care's motion, and we granted Rick's petition for a writ of review.  Because we conclude Rick lacked authority to execute the Agreement, we reverse and remand to the district court for further proceedings.

## ISSUES

[¶2]    The dispositive issues in this case are:

1. Did Julia's Durable Power of Attorney for Health Care (DPOAHC) give Rick actual authority to enter into the Arbitration Agreement?

2. Did Rick have apparent authority to enter into the Arbitration Agreement on behalf of Julia?

3. Was Rick authorized as Julia's "surrogate" under the Wyoming Health Care Decisions Act, Wyo. Stat. Ann. §§ 35-22-401 through 416 (LexisNexis 2019), to execute the Arbitration Agreement?

## FACTS

[¶3]    On September 18, 2013, Julia executed a DPOAHC appointing Rick as her agent for health care decisions "[i]n the event [she was] determined to be incapable of providing informed consent for medical treatment and surgical and diagnostic procedures[.]"  The agent's authority was spelled out in detail:

> My agent is authorized to act for me in all matters relating to my health care.  My agent's powers include, but are not limited to:
>
> - Full power to consent, refuse consent, or withdraw consent to all medical, surgical, hospital and relating to health care treatments and procedures on my behalf, according to my wishes as stated in this document, or as stated in a separate Living Will, Health Care Directive, or other similar type document, or as expressed to my agent by me;

1

- Full power to make decisions on whether to provide, withhold, or withdraw artificial nutrition and hydration on my behalf, according to my wishes as stated in this document, or as stated in a separate Living Will, Health Care Directive, or other similar type document, or as expressed to my agent by me;

- Full power to review and receive any information regarding my physical or mental health, including medical and hospital records . . .;

- Full power to sign any releases in order to obtain this information;

- Full power to sign any documents required to request, withdraw, or refuse treatment or to be released or transferred to another medical facility.

[¶4]    The DPOAHC further explained the agent's obligations as:

My agent will make health care decisions for me in accordance with this document, and in accordance with any instructions I give in a Living Will, Health Care Directive or other such document (either included in this document or as a separate document), and my other wishes to the extent known to my agent. To the extent my wishes are unknown, my agent will make health care decisions for me in accordance with what my agent determines to be in my best interest. In determining my best interest, my agent will consider my personal values to the extent known to my agent.

The DPOAHC specifically limited the agent's power: "My agent does not have authority to act for me for any other purpose unrelated to my health care."

[¶5]    Just before the signature line, Julia made the following affirmations:

I fully understand that by signing this document, I will permit my agent to make health care decisions for me. I understand that my signature on this document gives my agent authority to provide, withhold, or withdraw consent to health care treatments or procedures on my behalf; to apply for public

2

benefits to defray the cost of my health care; and to authorize my admission to or transfer from a health care facility. . . .

[¶6]    Julia was admitted twice to LCCC, Life Care's skilled nursing facility in Casper, Wyoming.  This case focuses on Life Care's actions during Julia's second stay at LCCC, which began on June 16, 2015.  Life Care concedes Julia was legally incapacitated at the time of admission.  Because of Julia's incapacity, Rick acted as her agent under the DPOAHC for her admission into LCCC; Rick provided the DPOAHC to LCCC.

[¶7]    Signing as Julia's "Legal Representative," Rick executed an Arbitration Agreement each time Julia was admitted to LCCC.  However, Rick did not sign the second Arbitration Agreement until two days after Julia's admission.  The first page of the Arbitration Agreement began with an explanation of the arbitration process and the benefits of resolving disputes by arbitration rather than civil litigation.  It then stated: "The following arbitration agreement is optional.  By signing it, you will give up your constitutional right to a jury or court trial and you agree that any dispute between you and the facility will be subject to arbitration."

[¶8]    The "Agreement" section, which was also on the first page, stated:

> The following is an agreement (the "Arbitration Agreement") to arbitrate any dispute that might arise between Julia Miller [handwritten] (the "Resident") and Life Care Center of Casper [handwritten] (the "Facility"). ... In consideration of the benefits of the use of arbitration in the efficient resolution of conflicts and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by all parties hereto, intending to be legally bound, the parties hereby agree as follows:
>
> The parties agree that they shall submit to binding arbitration all disputes against each other and their agents, affiliates, governing bodies and employees arising out of or in any way related or connected to the Resident's stay and care provided at the Facility, including but not limited to any disputes concerning alleged personal injury to the Resident caused by improper or inadequate care, including allegations of medical malpractice; any disputes concerning whether any statutory provisions relating to the Resident's rights under Wyoming law were violated; and any other dispute under Wyoming or federal law based on contract, tort, or statute.  ...

3

[¶9]   The third page of the Arbitration Agreement[1] included the acknowledgement and signature lines:

> THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ THIS ARBITRATION AGREEMENT AND UNDERSTANDS THAT BY SIGNING THIS ARBITRATION AGREEMENT EACH HAS WAIVED HIS/HER RIGHT TO A TRIAL, BEFORE A JUDGE OR JURY, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF THE TERMS OF THE ARBITRATION AGREEMENT.

Immediately following the capitalized statement, there were signature lines for the "Resident," the "Legal Representative," and the "Facility Representative." The Facility Representative and Rick, as Julia's Legal Representative, signed the Arbitration Agreement; Julia did not sign it.

[¶10]  Julia died on August 14, 2017, allegedly from injuries sustained during a series of mishaps at LCCC. Rick was appointed the wrongful death representative of her estate and filed a claim with the State of Wyoming Medical Review Panel. *See* Wyo. Stat. Ann. §§ 9-2-1513 through 1523 (LexisNexis 2019) (Wyoming Medical Review Panel Act of 2005). The panel dismissed the claim, allowing Rick to pursue legal action.

[¶11]  Rick filed a complaint in the district court on October 31, 2019, stating claims of negligence and premises liability against Life Care. Less than a month later, Life Care filed a motion to compel arbitration. Rick opposed the motion, and the district court held a hearing on the matter. The court granted Life Care's motion to compel arbitration and stayed the district court proceedings. We granted Rick's petition for writ of review.

## STANDARD OF REVIEW

[¶12]  The parties disagreed about whether their dispute had to be arbitrated. Wyo. Stat. Ann. § 1-36-104 (LexisNexis 2019) states:

> (a) On application of a party showing an arbitration agreement and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration. If the opposing party denies the existence of the agreement to

---

[1] There are numerous copies of the Arbitration Agreement in the record. However, they are all missing the second page. Neither party indicates the missing page has any bearing on this controversy.

4

> arbitrate, the court shall proceed summarily to determine the issue raised and shall order or deny arbitration accordingly.

*See also,* 9 U.S.C. § 4 (similar provision of the Federal Arbitration Act); *Am. Nat'l Bank of Denver v. Cheyenne Housing Auth.,* 562 P.2d 1017, 1020 (Wyo. 1977) ("The role of the [c]ourt in such an instance, where one party seeks to enforce an arbitration agreement and the other party contends that the agreement does not apply to the dispute, is to proceed summarily to the determination of the issue so raised.") (citation and quotation marks omitted).

[¶13]  In *Hancock v. Am. Tel. & Tel. Co., Inc.,* 701 F.3d 1248, 1261 (10th Cir. 2012), the Tenth Circuit described a framework similar to summary judgment practice for reviewing a request to arbitrate.  When the parties dispute the existence of an enforceable agreement to arbitrate, a court may grant a motion to compel arbitration if "'there are no genuine issues of material fact regarding the parties' agreement.'" *Id.* (quoting *Avedon Eng'g, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir. 1997)).  The moving party has the burden of establishing the existence of an arbitration agreement that applies to the dispute.  *Id.*  Courts "'should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.'" *Id.* (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 (3d Cir. 1980)).  "We review a district court's grant of a motion to compel arbitration de novo." *Id.* (citing *Avedon Eng'g, Inc.,* 126 F.3d at 1283).

## DISCUSSION

[¶14]  Under the Federal Arbitration Act, 9 U.S.C. §§ 1 through 16, and the Wyoming Uniform Arbitration Act, Wyo. Stat. Ann. §§ 1-36-101 through 119 (LexisNexis 2019), the rights and obligations to arbitrate are created by contract.  *Kindred Healthcare Operating, Inc. v. Boyd,* 2017 WY 122*,* ¶¶ 12-13, 403 P.3d 1014, 1018-19 (Wyo. 2017).  Arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of the contract." Section 1-36-103.  *See also,* 9 U.S.C. § 2.  Courts apply state law principles governing contract formation in deciding whether an arbitration agreement is enforceable.  *Boyd,* ¶ 12, 403 P.3d at 1018; *Fox v. Tanner*, 2004 WY 157, ¶ 18, 101 P.3d 939, 944 (Wyo. 2004) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)).

[¶15]  Life Care claims that, due to the federal policy favoring arbitration, we must resolve any doubts in favor of arbitration.  *See Volt Info. Scis., Inc. v. Bd. of Trs.,* 489 U.S. 468, 475-76, 109 S.Ct. 1248, 1253-54, 103 L.Ed.2d 488 (1989); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-26, 103 S.Ct. 927, 941-43, 74 L.Ed.2d 765 (1983).  This policy applies to determining the <u>scope</u>, not the <u>existence</u>, of a valid arbitration agreement. *Granite Rock Co. v. Int'l Bd. of Teamsters,* 561 U.S. 287, 302, 130 S.Ct. 2847, 2859, 177 L.Ed.2d 567 (2010) ("[W]e have never held that [the presumption

of arbitrability] overrides the principle that a court may submit to arbitration only those disputes … that the parties have agreed to submit." (citations and quotation marks omitted)); *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014) ("[B]efore the [Federal Arbitration] Act's heavy hand in favor of arbitration swings into play, the parties themselves must *agree* to have their disputes arbitrated." (emphasis in original)); *Landry v. Transworld Sys. Inc.*, 149 N.E.3d 781, 785 (Mass. 2020) ("[I]t remains a fundamental principle that arbitration is a matter of contract, not something to be foisted upon the parties at all costs." (citations and quotation marks omitted)).

[¶16]  The district court concluded the Arbitration Agreement was enforceable because Rick had both express actual authority under the DPOAHC and apparent authority to execute the Arbitration Agreement on behalf of Julia.  *See Boyd,* ¶ 16, 403 P.3d at 1019 (an agent is "someone with actual or apparent authority to bind a principal to particular obligations") (citing *Ohio Cas. Ins. Co. v. W.N. McMurry Constr. Co.,* 2010 WY 57, ¶ 39, 230 P.3d 312, 326-27 (Wyo. 2010)).  Life Care maintains the district court's rulings regarding Rick's authority were correct and also argues he had the authority to sign the Agreement as Julia's "surrogate" under the Wyoming Health Care Decisions Act.  Rick claims the district court erred by ruling Julia's estate was bound by the Arbitration Agreement because he did not have actual or apparent authority to sign it and the surrogacy provisions of the Wyoming Health Care Decisions Act do not apply to these circumstances.

### 1.  *Express Actual Authority*

[¶17]  The district court determined Rick had express actual authority under the DPOAHC to sign the Arbitration Agreement.  "An agent has express actual authority to bind the principal when the principal, orally or in writing, specifically grants the agent the power to bind the principal."[2]  *Boyd,* ¶ 16, 403 P.3d at 1019.

[¶18]  "[A]s with other contracts, construction of a written contract creating an agency and the agent's authority thereunder are questions of law for the courts unless the instrument is ambiguous and depends on conflicting extrinsic evidence."  *Boyd,* ¶ 13, 403 P.3d at 1019 (citations omitted).  Our review of questions of law is de novo.  *Id.*, ¶ 12, 403 P.3d at 1019.  *See also, Ecocards v. Tekstir, Inc.,* 2020 WY 38, ¶ 18, 459 P.3d 1111, 1118 (Wyo. 2020)

---

[2] Life Care suggested at oral argument before this Court that Rick had implied actual authority to sign the Arbitration Agreement.  "Implied actual authority is established by the course of dealings between the [principal and agent] and the circumstances surrounding the case."  *Ohio Cas. Ins.,* ¶ 39, 230 P.3d at 326.  *See also, Barron v. Evangelical Luther Good Samaritan Soc.,* 150 N.M. 669, 265 P.3d 720, 725 (N.M. Ct. App. 2011) (actual authority may be implied from words or conduct of the principal to the agent or from the circumstances of the relationship (quotation marks and citation omitted)).  The district court did not address the theory of implied actual authority in its decision, and Life Care focuses on express actual authority and apparent authority in its appellate brief.  Furthermore, there is no evidence of a course of dealing between Julia and Rick outside of the DPOAHC that could be a basis for implied actual authority.  Consequently, we will not address implied actual authority.

(citing *Finley Res., Inc. v. EP Energy E&P Co., L.P.,* 2019 WY 65, ¶ 7, 443 P.3d 838, 842 (Wyo. 2019)).

[¶19]   We begin our analysis of the DPOAHC by considering its plain language. *Thornock v. Pacificorp,* 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016) (citing *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012)).

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.* [*v. Texaco*], 882 P.2d [212,] 220 [(Wyo.1994)]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo.1996).

*Claman*, ¶ 26, 279 P.3d at 1013 (quoting *Hunter v. Reece*, 2011 WY 97, ¶ 17, 253 P.3d 497, 501-02 (Wyo. 2011)). *See also, Boyd,* ¶¶ 12-13, 403 P.3d at 1018-19 (applying general rules of contract construction to a contract creating an agency). However, "it is the policy of Wyoming courts 'to construe powers of attorney strictly, and to hold the principal not bound unless the authority is exercised within the undoubted limits prescribed by the principal.'" *Stone v. First Wyo. Bank N.A., Lusk,* 625 F.2d 332, 344, n. 20 (10th Cir. 1980) (quoting *Luikart v. Boland*, 45 Wyo. 461, 21 P.2d 542, 543 (1933) (emphasis omitted)). *See also, Boyd,* ¶¶ 18-19, 403 P.3d at 1020 (applying the strict construction rule enunciated in *Stone* and *Luikart*).

[¶20]   Julia stated in the DPOAHC:  "My agent is authorized to act for me in all matters relating to my health care."  A non-exclusive list of specific powers granted to Rick directly followed that statement.  The list included the power to consent, refuse consent, or withdraw consent to all medical, surgical, hospital and related health care treatments and procedures for Julia; the power to make decisions on whether to provide artificial nutrition and hydration to Julia; the power to review and receive information regarding Julia's physical or mental health; and the power to sign any documents to effectuate those powers. The DPOAHC also allowed Rick to apply for public benefits to defray the costs of Julia's health care and to authorize her admission to or transfer from a health care facility.  Julia specifically limited Rick's decision-making authority when she stated in the DPOAHC that he did not have authority to act for her "for any other purpose unrelated to [her] health care."

7

[¶21] The plain language of the DPOAHC does not address arbitration agreements or the resolution of legal claims. Instead, Rick's powers all pertain to decisions regarding securing or declining care for Julia's physical and mental health. Nevertheless, Life Care argues Rick had discretion to enter into the Arbitration Agreement because the DPOAHC gave Rick the following authority: "To the extent my wishes are unknown, my agent will make health care decisions for me in accordance with what my agent determines to be in my best interest. In determining my best interest, my agent will consider my personal values to the extent known to my agent." The plain language of this section of the DPOAHC did not give Rick express authority to enter into the Arbitration Agreement. The agent's discretionary authority applied only to health care decisions for which Julia's wishes were unknown. As we will explain, *infra,* the decision to enter into an arbitration agreement is not a "health care decision."

[¶22] The district court opined Rick had the power to execute the Arbitration Agreement because he also executed documents to pay for Julia's care at LCCC. This holding assumes Rick had the power to execute the financial documents and the authority to execute the Arbitration Agreement flowed therefrom. We have not been called upon to decide whether Rick had the authority to execute the financial documents. We do note, however, the language of the DPOAHC provides some support for this argument because it gave Rick authority to apply for public assistance to defray the costs of Julia's nursing home care. In comparison, as we stated above, the DPOAHC does not mention arbitration or give Rick authority to resolve Julia's legal claims. We interpret powers of attorney strictly; therefore, we cannot infer Rick had explicit power to sign the Arbitration Agreement merely because he executed documents to pay for Julia's care.

[¶23] The limited focus of the DPOAHC stands in marked contrast to the broad power of attorney at issue in *Boyd,* ¶¶ 17-18, 403 P.3d at 1019-20. There, the principal, Althea Boyd, gave the agent, Leanna Putnam, a "Durable General and Medical Power of Attorney." *Id.* We held the power of attorney authorized Ms. Putnam to execute an arbitration agreement. *Id.,* ¶ 19, 403 P.3d at 1020.

> [The "Durable General and Medical Power of Attorney"] gave Ms. Putnam actual authority "to exercise or perform any act, power, ... relating to any person, matter, transaction or property," including "by way of example but without limitation" the power to contract, as fully as Aletha might do if personally present. Rather than limiting Ms. Putnam's authority, the power of attorney gave her the authority "<u>without limitation</u>" to perform specifically enumerated powers, including the power and authority to sign contracts and agreements "of whatever kind" as necessary "or proper" in exercising the powers granted in the general power of attorney. [T]he power of attorney did not limit Ms. Putman

8

to signing necessary contracts, but instead gave her broad power to sign agreements as "necessary or proper" in exercising the authority granted to her. Given the broad language of the power of attorney, we hold that it included the authority to sign the [arbitration] agreement.

*Id.* (emphasis in original).

[¶24]   Life Care claims Rick had authority to agree to arbitration because the DPOAHC authorized him to make "health care decisions" for Julia.  Although the DPOAHC included a non-exclusive list of the agent's powers within the general categories of "health care" and "health care decisions," it did not specifically define those terms.  In Wyoming, the ability to create a durable power of attorney which gives an agent authority to make health care decisions if the principal lacks capacity is established by the Wyoming Health Care Decisions Act, §§ 35-22-401, 403(b) and (d).  The Wyoming Health Care Decisions Act provides definitions for "health care" and "health care decisions" that we must apply to Julia's DPOAHC.

[¶25]   Under the Wyoming Health Care Decisions Act, "health care" is  defined as "any care, treatment, service or procedure to maintain, diagnose or otherwise affect an individual's physical or mental condition."   Section 35-22-402(a)(viii).   "'Health care decision' means a decision made by an individual or the individual's agent . . . regarding the individual's health care, including: (A) Selection and discharge of health care providers or institutions; (B) Approval or disapproval of diagnostic tests, surgical procedures, programs of medication and orders not to resuscitate; and (C) Directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care." Section 35-22-402(a)(ix).  *Compare Boyd,* ¶¶ 17-19, 403 P.3d at 1019-20 (analyzing agent's powers under a "Durable General and Medical Power of Attorney").

[¶26]   Interpretation of statutes is a matter of law for the court. *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2017 WY 6, ¶ 15, 387 P.3d 725, 730 (Wyo. 2017); *DB v. State (In re CRA),* 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016).  In interpreting a statute, we search for the legislature's intent as reflected in the statutory language. *Vance v. City of Laramie,* 2016 WY 106, ¶ 12, 382 P.3d 1104, 1106 (Wyo. 2016).  "If the [statutory language] is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning." *In re CRA,* ¶ 16, 368 P.3d at 298.  We give effect to each word, clause and sentence chosen by the legislature, and construe them *in pari materia. Pedro/Aspen, Ltd. v. Bd. of Cnty. Comm'rs,* 2004 WY 84, ¶ 27, 94 P.3d 412, 420 (Wyo. 2004).  A statute is not interpreted in a way that renders a portion of it meaningless or adds language to it. *Id. See also, MF v. State,* 2013 WY 104, ¶ 11, 308 P.3d 854, 858 (Wyo. 2013).  "In ascertaining the meaning of a given law, we consider and construe in harmony all statutes relating to the same subject or having the same general

9

purpose." *Vance,* ¶ 12, 382 P.3d at 1106-07 (citing *Thunderbasin Land, Livestock & Inv. Co. v. Laramie Cnty.,* 5 P.3d 774, 779 (Wyo. 2000)).

[¶27] The statutory language in this case is clear. To be a "health care decision," the determination must pertain to the principal's physical or mental condition. In contrast, arbitration is a means of resolving a legal dispute outside of the typical civil litigation process – a definition unrelated to physical or mental condition. *See* Black's Law Dictionary, 125 (10th ed. 2014); *Scherer v. Schuler Custom Homes Constr., Inc.,* 2004 WY 109, ¶ 16, 98 P.3d 159, 163 (Wyo. 2004) (Arbitration is a form of alternative dispute resolution which "allows parties to resolve their differences in a less expensive and more timely manner than traditional litigation does."). Rick's decision to enter into the Arbitration Agreement did not relate to Julia's physical or mental condition.

[¶28] Life Care asserts Rick had the authority to execute the Arbitration Agreement as part of the process of admitting Julia to LCCC. The DPOAHC, as interpreted consistent with the Wyoming Health Care Decisions Act, clearly gave Rick authority to admit Julia to LCCC as part of his responsibilities to arrange for her health care and to select health care facilities and providers for her. However, the Arbitration Agreement was not required for admission to the facility; it plainly stated it was "voluntary" and "optional."[3] The lack of relationship between Julia's admission to LCCC and the Arbitration Agreement is further evidenced by the fact she was admitted to LCCC on June 16, 2015, but Rick did not sign the Arbitration Agreement until June 18, 2015.

[¶29] Life Care claims several cases from other jurisdictions support its assertion that the decision to agree to arbitrate disputes with a health care facility is a health care decision. In *Owens v. Nat'l Health Corp.,* 263 S.W.3d 876, 883-84 (Tenn. 2007), the Tennessee Supreme Court ruled the decision to enter into an arbitration agreement was part of the attorney-in-fact's duties under a health care power of attorney and Tennessee statutes. *Owens* does not apply to the present case. The power of attorney in *Owens* granted the attorney–in–fact the power and authority to execute any waiver, release or other document necessary to implement the health care decisions. *Id.* at 883. The arbitration agreement was necessary to implement the health care decision to admit the principal to a nursing home because it was integrated into the admission agreement. *Id.* at 884. *See also, Mississippi Care Ctr. of Greenville, LLC v. Hinyub,* 975 So.2d 211, 218 (Miss. 2008) (indicating execution of an arbitration agreement is considered a health care decision and, therefore, within the authority of a health care agent when the arbitration provision is required for admission to a long-term care facility).

---

[3] Rick maintains that, under federal law, admission to a long-term care facility cannot be conditioned upon execution of a binding arbitration agreement. *See* 42 C.F.R. § 483.70(n). There is no argument that Life Care required Rick to sign the arbitration agreement on behalf of Julia before she could be admitted to LCCC.

10

[¶30]   In *Hogan v. Country Villa Health Servs.,* 55 Cal. Rptr. 3d 450 (Cal. Ct. App. 2007), and *Garrison v. Superior Court,* 33 Cal. Rptr. 3d 350 (Cal. Ct. App. 2005), the principals executed health care powers of attorney authorizing their agents to make health care decisions on their behalf.  *Hogan,* 55 Cal. Rptr. 3d at 452; *Garrison,* 33 Cal. Rptr. 3d at 353.  The two California appellate courts determined the agents' decisions to enter into arbitration agreements at the time of the principals' admission into nursing homes were health care decisions.  *Hogan,* 55 Cal. Rptr. 3d at 455; *Garrison,* 33 Cal. Rptr. 3d at 360. The precedential value of *Hogan* and *Garrison* is questionable because a later California court of appeals decision disagreed with *Garrison's* broad interpretation of the term "health care decision."  *Young v. Horizon West, Inc.,* 163 Cal. Rptr. 3d 704, 711 (Cal. Ct. App. 2013).  Furthermore, unlike in this case, the arbitration agreements at issue in *Hogan* and *Garrison* were executed at the time of the principals' admission to the nursing homes. *Hogan,* 55 Cal. Rptr. 3d at 451-52; *Garrison,* 33 Cal. Rptr. 3d at 356-57.

[¶31]   Finally, Life Care directs us to *Barron v. Evangelical Lutheran Good Samaritan Soc.,* 265 P.3d 720, 727-29 (N.M. Ct. App. 2011), as authority that entering into an arbitration agreement is a health care decision.  *Barron* is inapposite because it did not address an agent's express actual authority granted in a power of attorney.  Instead, it considered whether the agent had express or implied actual authority or apparent authority to sign an admission agreement which contained an arbitration clause because the principal told the nursing home staff the agent would be completing her "admission paperwork."  *Id.* at 722, 726-29.

[¶32]   Most jurisdictions have ruled execution of an arbitration agreement is not a health care decision.  *See Johnson v. Kindred Healthcare, Inc.,* 2 N.E.3d 849, 857-59 (Mass. 2014) (collecting cases).  In *Estate of Irons ex rel. Springer v. Arcadia Healthcare, L.C.,* 66 So.3d 396, 399-400 (Fla. Ct. App. 2011), the Florida Court of Appeals held the authority granted to the agent by the principal in a health care power of attorney extended only to decisions regarding the provision of health care, not to arbitration decisions.  In *Life Care Centers of Am. v. Smith,* 681 S.E.2d 182, 185 (Ga. Ct. App. 2009), the Georgia Court of Appeals stated, "the plain language of the health care power of attorney did not give [the agent] the power to sign away [the principal's] right to a jury trial."  *See also, Primmer v. Healthcare Indus. Corp.,* 43 N.E.3d 788, 793-95 (Ohio Ct. App. 2015) (attorney-in-fact under a power of attorney for health care did not have authority to bind the principal to an arbitration agreement because it did not fall within his authority to make health care decisions); *Tex. Cityview Care Ctr., L.P. v. Fryer,* 227 S.W.3d 345, 352 (Tex. Ct. App. 2007) (medical power of attorney did not give agent authority to make legal decisions, including the decision to waive a jury trial by agreeing to arbitrate any claims against the nursing home); *State ex rel. AMFM, LLC v. King,* 740 S.E.2d 66, 75-76 (W.Va. 2013) (decision to enter into an optional arbitration agreement was not a health care decision under the West Virginia Health Care Decisions Act, W.Va. Code § 16-30-1 *et. seq.*).

[¶33] The majority position is, in our view, more applicable to this case. Other than the fact the Arbitration Agreement was between Life Care (a health care provider) and Julia (a resident/patient), there was nothing that linked the Arbitration Agreement to Julia's health care. It was not required for admission to LCCC; Julia would have been admitted regardless of whether Rick signed the agreement. In fact, Rick did not sign the Arbitration Agreement until two days after Julia's admission. Moreover, it did not otherwise affect Julia's physical or mental health.

[¶34] The district court erred in concluding Rick had express actual authority to execute the Arbitration Agreement on Julia's behalf.

## 2. *Apparent Authority*

[¶35] The district court also concluded the Arbitration Agreement was binding upon Julia because Rick had apparent authority to sign it. The court stated:

> With regard to the apparent authority of -- I do believe there was express authority. But I also believe that there was apparent authority granted to [Rick] just based on all of the actions in this case, all of the decisions that he made, the conversations that he had with the various providers, that folks were relying on him completely to make all decisions regarding [Julia's] care, and that she be placed in this facility not once but twice.

[¶36] "Apparent authority is created when the principal holds the agent out as possessing the authority to bind the principal or when the principal allows the agent to claim such authority." *Cargill, Inc. v. Mountain Cement Co.,* 891 P.2d 57, 62 (Wyo. 1995) (citing *Ulen v. Knectelle,* 50 Wyo. 94, 103-04, 58 P.2d 446, 449 (1936)). In *Cargill,* 891 P.2d at 62-63, we adopted the test from *Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 993-94 (2d. Cir. 1991), for determining if an agent had apparent authority:

> To recover on [an apparent authority theory] the third party must establish two facts: (1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent.

(citations and quotation marks omitted). *See also, Velasquez v. Chamberlain,* 2009 WY 80, ¶ 19, 209 P.3d 888, 893 (Wyo. 2009).

[¶37] In *Cargill,* 891 P.2d at 61, Salt Creek Welding contracted to build a steel silo for Mountain Cement Company. "Salt Creek contacted Charlie Mandry (Mandry), a salesman

for Cargill, Incorporated (Cargill), and ordered A36 steel plates for use in constructing the Mountain Cement silo." *Id.* Because Cargill did not have the steel plates in stock, Mandry contacted one of Cargill's suppliers to acquire them. *Id.* The wrong steel plates were delivered to the job, Salt Creek installed them, and the silo collapsed. *Id.* Mountain Cement sued all involved, and Salt Creek cross-claimed against Cargill and others in the chain of supply for the steel plates. *Id.* One of the issues at trial was whether Mandry acted as Cargill's agent in procuring the wrong steel plates. *Id.* at 61-62. We ruled there was sufficient evidence that Mandry had apparent authority to act on behalf of Cargill. *Id.* at 62. "Cargill provided Mandry with a telephone, an expense account and office space. These facts indicate that Cargill intended to hold Mandry out as an agent who possessed the authority to bind Cargill. Further, Salt Creek reasonably relied on that apparent authority when it ordered steel from Cargill." *Id. See also, Velasquez,* ¶¶ 5-9, 19-30, 209 P.3d at 890, 893-94 (tenant had apparent authority to bind the property owner when he was aware of an agreement between the neighbor and the tenant regarding use of his property and he did not object).

[¶38] When we apply this precedent to the case at bar, it is clear Rick did not have apparent authority to enter into the Arbitration Agreement on behalf of Julia. There is no evidence that Julia held Rick out to Life Care as having authority to enter into the Agreement. The only representation made by Julia was in her DPOAHC and, as discussed above, that document did not give Rick authority to enter into the Arbitration Agreement. In fact, it specifically disavowed Rick's authority to act for her "for any other purpose unrelated to [her] health care."

[¶39] In *Evans v. Pioneer Bank of Evanston,* 809 P.2d 251, 252-53 (Wyo. 1991), we observed:

> Whenever a person deals with an agent knowing that the agent is authorized to act on behalf of the [principal] by virtue of a power of attorney, then the person is bound to ascertain and know the character and extent of the power of attorney under which the agent assumes to act. Moreover, if the person has knowledge that the agent has limited authority, then he may not rely on the theory of apparent authority to enforce liability against the [principal].

(Citations omitted). Stated another way, "'[a]pparent authority and its effect vanish ... in the presence of the actual knowledge of the third party as to the real scope of the agent's authority, or when the former has knowledge of facts which would put him upon inquiry as to the actual warrant of the agent.'" *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 401 (10th Cir. 1986) (quoting *Bank of Or. v. Hiway Products,* 41 Or.App. 223, 598 P.2d 318, 320 (1979)) (other citation omitted).

13

[¶40]  Moreover, Julia could not have personally held Rick out to Life Care as her agent for execution of the Arbitration Agreement because she was incompetent when Rick signed it.  In *Ping v. Beverly Enter., Inc.,* 376 S.W.3d 581, 594 (Ky. 2012), the Supreme Court of Kentucky stated the principal was "incapacitated at the time of her admission and so could not have done anything to lead [the nursing home] to believe that [the agent] had more authority than the power of attorney said she had." *See also, Broughsville v. OHECC, LLC,* 2005 WL 3483777, *3 (Ohio Ct. App. 2005) (unpublished decision) (an incompetent person cannot establish apparent authority in an agent).

[¶41]  In making its decision in this case, the district court relied upon an unreported Wyoming federal district court order granting a motion to compel arbitration – *Moberg v. Kindred Healthcare, Inc.,* 14-CV-00254-F (D. Wyo. 2015) (unpublished decision).  Harriet Moberg was admitted to Kindred's nursing home in Cheyenne and her daughter, Debra Moberg, signed the admissions documents which apparently included an arbitration agreement.  *Id., *2.  At the time of admission, Debra was not authorized by a power of attorney to execute the documents on behalf of Harriet; however, Harriet signed a power of attorney giving Debra express authority to act as her agent twelve days <u>after</u> Debra signed the admission documents and arbitration agreement.  *Id., * 11.

[¶42]  Harriet died following a fall at the nursing home, and Debra sued Kindred for negligence.  *Id., *3.  Kindred filed a motion to compel arbitration.  Although Debra opposed the motion to arbitrate, she did not "deny she had authority to enter into the agreement."  *Id., *5-6.  Despite the fact Debra did not "oppose Kindred['s] argument that she acted as [Harriet's] agent . . . when she entered into the arbitration agreement on her mother's behalf," the court briefly addressed "her authority as signatory."  *Id., *10.  The court ruled Debra likely had "actual implied authority but also apparent authority to execute the arbitration agreement on behalf of her mother, [Harriet]."  *Id., *12.  It recited several reasons Kindred should be entitled to rely on Debra's apparent authority, including she selected Kindred for her mother's care, she communicated with Kindred on her mother's behalf, and she completed all the paperwork, including the arbitration agreement.  *Id., *12.  It also stated there was "no indication that any party ever objected or even raised concerns about [Debra] acting as her mother's agent during this process."  *Id.*

[¶43]  To the extent *Moberg* relied upon Debra's actions to find she had apparent authority to sign the arbitration agreement on behalf of Harriet, that holding is inconsistent with Wyoming law.  *Cargill* and *Velasquez* require a showing the third party relied on the representations of the principal, not the agent.  *Cargill,* 891 P.2d at 62; *Velasquez,* ¶¶ 19-20, 209 P.3d at 893-94.  *See also, Herbert Constr. Co.,* 931 F.2d at 993 ("[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal – not the agent.") (citation omitted).

[¶44] Life Care cites additional cases in support of its claim that Rick had apparent authority to sign the Arbitration Agreement on behalf of Julia, including *THI of N.M. at Vida Encantada, LLC v. Archuleta,* 2013 WL 2387752 (D. N.M. 2013) (unpublished decision); *Carraway v. Beverly Enters. Ala., Inc.,* 978 So.2d 27 (Ala. 2007); and *Broughsville*, 2005 WL 3483777. *THI* is inapposite because it did not involve a power of attorney or apparent authority. Instead, the federal district court ruled the agent had implied actual authority to sign all admission paperwork, which included an admission contract with an arbitration clause. *Id.,* *2, 8-9.

[¶45] *Carraway* and *Broughsville* are distinguishable from the case at bar because the principals were responsible for leading the nursing homes to believe the agents had apparent authority to sign arbitration agreements. In *Carraway*, 978 So.2d at 28, 30, the Alabama Supreme Court ruled the principal's brother had apparent authority to sign documents, including an arbitration agreement, admitting her to a nursing home. The evidence showed the principal was competent at the time of admission, she did not object to the agent signing the agreement, and she signed a durable power of attorney naming him as her attorney-in-fact shortly after admission. *Id.* Similarly, in *Broughsville,* 2005 WL 3483777, *2, the Ohio Court of Appeals ruled the agent had apparent authority to execute the arbitration agreement because the competent principal "was present at the signing of the agreement and made no attempt to stop [the agent,] to ask questions of [the nursing home] or to request to read the document."

[¶46] Because Julia was incompetent when Rick signed the Arbitration Agreement, she could not have made any representations to Life Care about Rick's authority. The only representations she made were in the DPOAHC, and it specifically limited Rick's powers. The district court erred by ruling Rick had apparent authority to enter into the Arbitration Agreement for Julia.

### 3. *Surrogate under the Wyoming Health Care Decisions Act*

[¶47] Life Care maintains Rick had authority to sign the Arbitration Agreement as Julia's "surrogate" under § 35-22-406(a) of the Wyoming Health Care Decisions Act. That provision states:

> (a)    If a valid advance health care directive does not exist, a surrogate may make a health care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician or the primary health care provider to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

*Id.*

15

[¶48]   Life Care's argument fails for two reasons.  First, as the opening clause of § 35-22-406(a) makes clear, a surrogate is allowed to make health care decisions <u>only</u> when a valid advance health care directive does not exist.  Julia's DPOAHC was an advance health care directive under the Wyoming Health Care Decisions Act.   Section 35-22-402(a)(i) ("'Advance health care directive' means an individual instruction or a power of attorney for health care, or both[.]").  Second, a surrogate's authority is limited to making health care decisions for an incapacitated patient.  We have already determined the decision to enter into the Arbitration Agreement was not a health care decision.  Therefore, the Act's surrogate provisions cannot apply to these circumstances.

## CONCLUSION

[¶49]   Julia's DPOAHC did not grant Rick express actual authority to sign the Arbitration Agreement, and she did not hold him out as having apparent authority to sign the Agreement.  Furthermore, Rick was not authorized to sign the Arbitration Agreement as Julia's surrogate under the Wyoming Health Care Decisions Act.  We reverse and remand to the district court for further proceedings.